IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 124,676

STATE OF KANSAS,
*Appellant*,

v.

G.O.,
*Appellee*.

SYLLABUS BY THE COURT

1.

      The Fifth Amendment to the United States Constitution, which applies to the states through the Fourteenth Amendment to the United States Constitution, protects the right of a person to remain silent, unless the individual chooses to speak in the unfettered exercise of the person's own will, and to suffer no penalty for such silence. Under *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966), law enforcement officers must inform individuals subject to custodial interrogation of this and other Fifth Amendment rights. Once the *Miranda* advisories are communicated, an individual may waive the right to remain silent, provided the waiver is made voluntarily, knowingly, and intelligently. Courts use this same voluntariness standard to evaluate a juvenile's waiver of *Miranda* rights.

2.

      The Due Process Clause of the Fourteenth Amendment applies when the interrogation techniques were improper because, in the circumstances of the case, the confession is not the product of an individual's free and rational will. Applying this aspect of the due process protection requires courts to assess the totality of all an interrogation's surrounding circumstances—both the characteristics of the individual and the details of

1

the interrogation—to determine if a confession is a free and unconstrained choice by its maker.

3.

Coercive police activity is a necessary predicate to a finding that a confession is not voluntary. And there must be a link between coercive activity of the State and a resulting confession by a defendant.

4.

An individual's mental condition, by itself and apart from its relation to official coercion, can never dispose of the inquiry into constitutional voluntariness of a confession.

5.

Even where there is a link between police misconduct and a confession, it does not automatically follow that there has been a violation of the Due Process Clause of the Fourteenth Amendment. Voluntariness must be determined from the totality of the circumstances.

6.

Potential circumstances of the interrogation that may be relevant to whether a confession was voluntary include, but are not limited to, the length of the interview; the accused's ability to communicate with the outside world; any delay in arraignment; the length of custody; the general conditions under which the statements took place; any physical or psychological pressure brought to bear on the accused; the officer's fairness in conducting the interview, including any promises, inducements, threats, methods, or strategies used to compel a response; whether the accused was informed of the right to counsel and the right against self-incrimination through the *Miranda* advisory; and

whether the officer negated or otherwise failed to honor the accused's Fifth Amendment rights.

7.

Potential characteristics or circumstances of the accused that may be relevant to a determination of whether a confession was voluntary include, but are not limited to, the accused's age; maturity; intellect; education; fluency in English; physical, mental, and emotional condition; and experience, including experience with law enforcement.

8.

When the protections of the Fifth and Fourteenth Amendments apply, the State bears the burden of proving by a preponderance of the evidence that an individual voluntarily, intelligently, and knowingly waived rights guaranteed by the Fifth Amendment to the United States Constitution and voluntarily—that is, based on the person's unfettered will—made a statement. To do so, the State must establish that police or other state actors did not intimidate, coerce, deceive, or engage in other misconduct that, when considered in the totality of the circumstances, was the motivation for the individual to make a statement.

9.

On appeal from a trial judge's determination of whether the State met the burden of proving an individual voluntarily confessed, appellate courts apply a mixed standard of review. The appellate court reviews the trial judge's findings of fact about the totality of circumstances to see whether each is supported by substantial competent evidence. Appellate courts assess de novo the trial judge's legal conclusion based on those facts. This means the appellate court gives no deference to the trial judge's legal conclusion about voluntariness.

10.

Neither K.S.A. 2022 Supp. 60-460(f)(2)(B), a hearsay exception, nor the reliability standard it incorporates apply when a court decides whether an accused's statements to law enforcement officers violate the Due Process Clause of the Fourteenth Amendment. The purpose of the Due Process Clause is not to exclude presumptively false evidence, but to prevent fundamental unfairness in the use of evidence whether true or false. Holdings to the contrary in *State v. McCarther*, 197 Kan. 279, 285, 416 P.2d 290 (1966), and its progeny are overruled.

Review of the judgment of the Court of Appeals in an unpublished opinion filed September 23, 2022. Appeal from Shawnee District Court; NANCY E. PARRISH, judge. Oral argument held January 31, 2023. Opinion filed March 1, 2024. Judgment of the Court of Appeals reversing the district court is reversed. Judgment of the district court is affirmed.

*Natalie Chalmers*, assistant solicitor general, argued the cause, and *Derek Schmidt,* attorney general, was with her on the briefs for appellant.

*Reid T. Nelson,* of Capital and Conflicts Appeals Office, argued the cause and was on the briefs for appellee.

The opinion of the court was delivered by

LUCKERT, C.J.:  G.O., a minor, seeks to prevent the State from using statements he made during an interview with a police officer at trial. He argues the officer's coercive tactics caused him to involuntarily waive rights protected by the Fifth and Fourteenth Amendments to the United States Constitution. The trial judge agreed with his arguments, but a divided panel of the Court of Appeals reversed the suppression order. *State v. G.O.*, No. 124,676, 2022 WL 4391366, at *9 (Kan. App. 2022) (unpublished opinion).

4

We affirm the trial judge and reverse the Court of Appeals. In reversing the Court of Appeals, we hold the Due Process Clause of the Fourteenth Amendment protects against an involuntary confession being used as evidence against an accused regardless of its reliability. In reaching that holding, we overrule caselaw cited by the Court of Appeals majority in holding the record did not support the conclusion that G.O. falsely confessed and, because his confession was reliable, it should not be suppressed. Rather than focusing on the reliability of G.O.'s confession, we examine the coercive nature of the police detective's interrogation techniques and the totality of other circumstances surrounding the interrogation. This review leads us to hold that the interrogation offended concepts of due process.

FACTUAL AND PROCEDURAL BACKGROUND

When G.O. was 16 years old, his younger stepsister, while hospitalized, revealed G.O. had molested her. Hospital personnel notified G.O.'s mother, his stepfather, and the Kansas Department for Children and Families, known as DCF. A DCF representative came to G.O.'s home and told G.O.'s mother that G.O. would need to be removed from the home by the time G.O.'s stepsister was released from the hospital. The representative also suggested individual and family counseling and discussed a long-term goal of reintegrating the family. The DCF representative said that all family members would be interviewed, and they would be contacted to set up the interviews.

The next call received by G.O.'s mother was from a Topeka Police Department detective. G.O.'s mother testified she understood DCF had referred the family for interviews, so they cooperated in setting up interviews with the detective. The detective interviewed G.O.'s stepsister first and then other members of the family, except G.O. The

5

detective then told G.O.'s mother he would like to interview G.O. at the police station. He assured her that G.O. would not be arrested, only interviewed.

G.O. had moved in with his father, but G.O.'s mother drove him to the interview at the Topeka Police Department. She told G.O., who had no earlier contact with law enforcement, that he had to talk to the detective because she "thought we all had to." She also told G.O. that "he was going to have to give more details when he talked to" the detective than he had when he talked to her about the allegations. No one explained to her that G.O. and the other family members could refuse to talk to the police.

When they arrived at the police station, G.O.'s mother asked if she could sit in on the interview. The detective told her to wait in the lobby. He then took G.O. to an interview room.

The detective began the interview by saying they would just "hang out" in the room and that he would not take long so that G.O. could get back to school. G.O. explained he was on his way to the orthodontist to repair a broken bracket and wire on his braces. The detective reassured G.O. their talk would not take long. He then thanked G.O. for coming "so we can get some stuff cleared up. Your Mom probably told you but I'm going to tell you again, all right. You are not under arrest." G.O. said he knew. The detective added: "You're not going to be under arrest when we're done." G.O. nodded his head affirmatively.

The detective then framed the purpose of the meeting: "I'm just trying to clear some things up for you and your sister, especially for your sister." G.O. replied, "Yeah," and the detective continued: "I mean, you know, I think you know that your sister is kinda hurting right now." G.O. responded: "Oh, big time. I want her to be better." The detective followed that by saying, "If we can get some of this stuff cleared up and kind of

6

aired out, I think that's going to help out everybody. Okay?" When G.O. replied, "Yeah," the detective added: "And, so, that's what we are here to do, right. This isn't about getting people in trouble. This is about trying to fix some things. Okay?" G.O. said, "Okay."

The detective then reiterated, "So we can all move on. Like I said, you are not under arrest. You are not going to be under arrest. But we're kinda sitting in this room, right? So I'm going to read you your *Miranda* rights just so you make sure you understand them." After reading the rights, the detective verified that G.O. understood, and he made sure G.O. meant "yes" when he answered, "mm hmm." The detective did not ask if G.O. wanted to waive his rights.

The detective asked about G.O.'s school and his interests. G.O. reported that he got good grades, planned to go to college, and hoped to work for Apple.

The detective then talked about the kind of work the detective did, explaining that previously he had investigated everything from shoplifting to homicide. The detective, who wore dress pants and an open collared shirt rather than a uniform and who did not have a visible firearm, added, "Now I work a lot with kids, usually young, young kids. Okay. The past few weeks I've been kind of talking to your sister, helping, trying to help her out."

G.O. responded by repeating, "I just want her to get better." Without further prompting, G.O. reported that he thought what happened with his stepsister connected to his own experiences when his daycare provider's son molested him. This was a theme G.O. would return to at other points during the interview. The detective told G.O. that "[a] lot of times these things [referring to G.O.'s conduct with his stepsister] happen because things have happened to people in the past, right? And those things kind of start to manifest themselves."

7

When asked to explain the specifics of what happened to him, G.O. hesitated to speak. The detective reiterated that the purpose of the interview was to help G.O.'s stepsister. "It's just something that you and I are going to talk about so we can move past it to help [your stepsister] out." The detective then said, "[L]ike if we talk here for 45 minutes and you tell me what happened and I go and I find out that some of those aren't true or some of the things you tell me wasn't everything, that's when things start to get out of control."

The detective renewed his request for details about what happened to G.O. as a child. After G.O. explained those events, the detective asked what happened between G.O. and his stepsister. When G.O. was again reluctant, the detective said that "we might as well rip the bandaid off" and then asked G.O. where he would like to start. G.O. said, "Preferably nowhere but we have to get somewhere."

G.O. eventually described sexual acts with his stepsister, including anal and oral sex that occurred about 5 to 10 times. G.O. was often reluctant to speak. The detective sometimes would prompt G.O. by telling him what his stepsister had said. G.O. usually replied to these comments by saying he did not remember but, if that is what she said, then it likely happened. Other times, the detective encouraged G.O. to help his stepsister, and he added, "This is your time to get it all out on the table." G.O. responded, "I know, yeah, I know." The detective also encouraged G.O. to get things "off his chest."

G.O. explained:  "All I want to do is I just want to go home. I want to get this done and over with. Get everything just cleared up and make sure I can just be less of a wreck." G.O. then described frequent anxiety and panic attacks and told the detective he was on medication as a result. He added that his mother said DCF wanted him to be in therapy and that he was seeing a therapist.

At the end of the interview, which lasted just under an hour, G.O. asked the detective if there was anything else he wanted to know.

*Procedural History*

More than two years after G.O.'s police interview, the State filed a complaint. The complaint charged G.O. with one count of aggravated criminal sodomy against a child younger than 14 when the offender was younger than 18, K.S.A. 2016 Supp. 21-5504, and one count of aggravated indecent liberties of a child younger than 14 when the offender was younger than 18, K.S.A. 2016 Supp. 21-5506(b)(3)(A). The State also moved for prosecution as an adult, which was granted.

G.O. quickly reached a plea agreement in which the State agreed to dismiss one charge and to recommend a departure sentence. G.O. entered a plea. But before sentencing, the trial judge allowed him to withdraw his plea after finding that the plea was not knowing and voluntary because the sentence recommended by both parties would have resulted in an illegal sentence. The case returned to the docket and was set for a preliminary hearing. After that hearing, the State filed an amended complaint, charging G.O. with 60 counts:  6 counts of aggravated criminal sodomy, 51 counts of aggravated indecent liberties with a child, 1 count of attempted rape, and 2 counts of rape.

G.O. moved to suppress his statement to the detective, contending his waiver of rights and his confession were not knowing and voluntary. The trial judge held an evidentiary hearing at which the detective and G.O.'s mother testified. The detective's testimony reviewed the setting for the interview, the reading of the *Miranda* warnings and G.O.'s response, and the things both he and G.O. said, all of which was consistent

9

with our summary. G.O.'s mother testified about G.O.'s maturity, mental health, learning disabilities that included attention deficit disorder, and schooling. She also explained her belief the interview was arranged at DCF's request with the goal of family reintegration.

In speaking about G.O.'s schooling and learning disabilities, G.O.'s mother testified that G.O. had always been less mature than his peers and he had learning disabilities. His school made testing accommodations by reading questions to him "so he could comprehend them better." When G.O. reached high school, he was making C's and D's "at best," except in orchestra, and he had failed several classes. In the school year during which the interview occurred, he moved to an alternative education program and was doing better there with smaller classes and more one-on-one time. His grades improved and, as G.O. had reported to the detective, his grades were "good." When asked if G.O. was on schedule to graduate, his mother responded, "No. He would not have graduated on time, if at all, had he not been moved up there." When informed that G.O. had told the detective he planned to go to college and hoped to work for Apple, his mother said, G.O. was "obsessed with all things Apple" and working for Apple meant "at the Apple store one day, not for the Apple Incorporated." She added there was no plan for G.O. to go to college because "he's not college material. And that's okay." Asked to characterize G.O.'s comments to the detective, she explained they were "[m]ore like . . . when you ask a kid[,] . . . what do you want to do when you grow up?"

The trial judge also viewed the video of the interview. She commented that she had watched it before in an earlier court proceeding.

After hearing the evidence and the arguments of the attorneys, the trial judge granted the motion to suppress. The judge did not issue a written memorandum order but orally made factual findings and discussed the applicable legal standards.

10

The judge began by commenting that "this is a close question" as to whether G.O.'s comments were voluntary. She then observed that the circumstances are "strikingly similar" to those presented in *State v. R.W.*, 58 Kan. App. 2d 135, 464 P.3d 27 (2020). She discussed the framework the *R.W.* court had followed in its analysis—factors the Kansas Supreme Court has listed to help weigh relevant circumstances when determining if a confession is voluntary. The judge found there were "certainly a number of parallels between" R.W.'s interview and G.O.'s when these factors are examined.

The judge focused on the fairness of the interview, which drove *R.W.*'s outcome and, in the judge's view, the outcome of G.O.'s motion. The judge stressed the detective's constant reassurances to G.O. that the interview's purpose was to help G.O.'s stepsister and everyone, not to get people in trouble:

> "I think the thing that may really tip the balance in this Court's opinion is why [G.O.] believed he was at the law enforcement center to talk with [the detective]. And that was pretty clear in the interview . . . because of what [the detective] told him, that they were there to talk about what would help his step sister, . . . and that nobody was in trouble. And so that seemed to be the purpose of his discussion."

The judge also found it significant that G.O.'s mother had told him that "he had to talk with the detective. They were all trying to cooperate for the benefit of" G.O.'s stepsister. The judge added that based on "how [G.O.] was providing information, it was clear that it was to help" his stepsister.

The judge then responded to some arguments G.O.'s attorney had presented about alleged procedural defects in the interview process. She noted the detective did not allow G.O.'s mother into the interview room, but the law did not require allowing a parent to attend the interview of someone of G.O.'s age. She also agreed with the factual basis of another of G.O.'s arguments, finding that the detective did not specifically ask G.O. to

waive his *Miranda* rights or otherwise verify the waiver. But she concluded that these failures made no difference in the legal analysis because the law does not require those formalities.

Finally, the judge ruled that G.O.'s confession was not voluntary and summarized the reasons for the decision:

"As I said, I think it's a very close question. But based on the issue with his education— the fact that he was in therapy and had had anxiety attacks—the fact that he had actually no prior experience with law enforcement, and that he believed that he was there to help his step sister, . . . who had been in placement and had some very difficult issues—I am going to find the statement was involuntarily made by [G.O.]."

The State brought an interlocutory appeal in the Court of Appeals under K.S.A. 2022 Supp. 22-3603. A divided panel of the Court of Appeals reversed the trial judge, holding that G.O.'s confession was voluntary. *State v. G.O.*, No. 124,676, 2022 WL 4391366, at *9 (Kan. App. 2022) (unpublished opinion). One Court of Appeals judge dissented, saying she would conclude that the totality of the circumstances supports the holding that G.O.'s confession was involuntary. 2022 WL 4391366, at *9 (Hurst, J., dissenting).

G.O. petitioned this court for review of the Court of Appeals decision, and the State filed a conditional cross-petition. We granted both petitions. We have jurisdiction under K.S.A. 20-3018(b) (allowing jurisdiction over petitions for review of Court of Appeals decisions); K.S.A. 60-2101(b) (Supreme Court has jurisdiction to review Court of Appeals decisions upon petition for review).

12

ANALYSIS

G.O. asks us to reverse the Court of Appeals majority and adopt the reasoning of the Court of Appeals dissent and the trial judge. He contends the trial judge correctly concluded his confession was involuntary. He argues the detective's conduct was misleading in three ways. First, the detective repeatedly made false reassurances that G.O. would not be arrested or be in any trouble if he revealed everything. Second, the detective never disclosed he was investigating a crime or that he was investigating G.O. And, third, the detective hid the true purpose of the interview by convincing G.O. that it was therapeutic—that is, that it was to help G.O.'s stepsister and everybody, including G.O.

The State does not argue that Fifth Amendment and Due Process Clause protections do not apply. Instead, it contends G.O. freely and voluntarily waived his Fifth Amendment and due process rights and voluntarily confessed. It also distinguishes *R.W.*, 58 Kan. App. 2d 135, the decision relied on by G.O., the trial judge, and the dissenting Court of Appeals judge. In addition, in the State's conditional cross-petition, it makes two arguments about circumstances considered by the trial judge. First, it contends G.O.'s struggles in school are irrelevant because nothing in the record suggests he struggled to understand questions during the interview or that the police officer exploited any educational difficulties. Second, it argues that giving *Miranda* warnings should be considered a factor undermining any claim of coercion.

The ultimate questions before us are whether G.O. knowingly, intelligently, and voluntarily waived his Fifth Amendment privilege against self-incrimination and whether the detective violated G.O.'s Fourteenth Amendment due process rights by coercing him to involuntarily make incriminating statements.

13

1. *General Overview of Applicable Law*

We separate these issues because G.O. mainly bases his arguments on the Fifth Amendment's self-incrimination privilege, while the Court of Appeals discussed the Due Process Clause. Although there are doctrinal and substantive differences in the rights granted under the two provisions, the same legal test of voluntariness ultimately applies to a determination of whether a confession was obtained in violation of an accused's rights under the Fifth and Fourteenth Amendments. See *Dickerson v. United States*, 530 U.S. 428, 433-34, 120 S. Ct. 2326, 147 L. Ed. 2d 405 (2000). To explain, we look to the applicable caselaw applying both the Fifth Amendment and the Due Process Clause of the Fourteenth Amendment.

The Fifth Amendment, which applies to the states through the Fourteenth Amendment, protects "'the right of a person to remain silent unless he chooses to speak in the unfettered exercise of his own will, and to suffer no penalty . . . for such silence.'" *State v. Brown*, 286 Kan. 170, 172-73, 182 P.3d 1205 (2008) (citing and quoting *Malloy v. Hogan*, 378 U.S. 1, 6, 8, 84 S. Ct. 1489, 12 L. Ed. 2d 653 [1964]). In *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966), the United States Supreme Court imposed a procedural safeguard, requiring law enforcement officers to inform individuals subject to custodial interrogation of their Fifth Amendment rights to remain silent and to have an attorney. Once the *Miranda* advisories are communicated, "[t]he defendant may waive effectuation of these rights, provided the waiver is made voluntarily, knowingly and intelligently." 384 U.S. at 444. Courts use "voluntariness" as shorthand for this test.

In *Fare v. Michael C.*, 442 U.S. 707, 725, 99 S. Ct. 2560, 61 L. Ed. 2d 197 (1979), the United States Supreme Court adopted the same voluntariness waiver standard— voluntarily, knowingly, and intelligently—to evaluate a juvenile's waiver of *Miranda*

14

rights. This voluntariness test thus applies to our consideration of G.O.'s motion to suppress his confession.

G.O. asserted both substantive and procedural Fifth Amendment rights in arguments to the trial judge. But on appeal G.O. did not raise the alleged procedural violations—that the detective did not verify G.O.'s waiver of rights or protect G.O., who was a minor, by involving his mother in the waiver. His abandonment of these arguments on appeal means those arguments are not preserved for our review. See *State v. Dooley*, 308 Kan. 641, 651, 423 P.3d 469 (2018). That abandonment does not forfeit G.O.'s ability to assert a violation of his substantive Fifth Amendment rights and to seek suppression of his confession, however. Even if *Miranda* advisories are read and an individual waives the rights, a confession can still be involuntary. See *State v. Palacio*, 309 Kan. 1075, 1087, 442 P.3d 466 (2019) (citing *Berkemer v. McCarty*, 468 U.S. 420, 433 n.20, 104 S. Ct. 3138, 82 L. Ed. 2d 317 [1984]) (recognizing availability of remedy but observing such instances are rare).

The Fifth Amendment test for voluntariness substantially tracks the voluntariness test applied under the Due Process Clause of the Fourteenth Amendment. *Colorado v. Connelly*, 479 U.S. 157, 164, 169-70, 107 S. Ct. 515, 93 L. Ed. 2d 473 (1986). The Court of Appeals framed its analysis under the Due Process Clause.

The Fourteenth Amendment's Due Process Clause states that no state shall "deprive any person of life, liberty, or property, without due process of law." Due process requires that confessions be voluntary. Under the Due Process Clause, "certain interrogation techniques, either in isolation or as applied to the unique characteristics of a particular suspect, are so offensive to a civilized system of justice that they must be condemned." *Miller v. Fenton*, 474 U.S. 104, 109, 106 S. Ct. 445, 88 L. Ed. 2d 405 (1985). This concept of a due process protection against involuntary confessions flows

15

from a "set of values reflecting society's deeply felt belief that the criminal law cannot be used as an instrument of unfairness, and that the possibility of unfair and even brutal police tactics poses a real and serious threat to civilized notions of justice." *Schneckloth v. Bustamonte*, 412 U.S. 218, 225, 93 S. Ct. 2041, 36 L. Ed. 2d 854 (1973).

*Fenton* noted two paths for applying due process protection against involuntary confessions: (1) Those that are inherently coercive and a per se violation of the Due Process Clause and (2) those where a state actor uses interrogation techniques that because of the unique circumstances of the suspect are coercive. 474 U.S. at 109.

The first path relates to interrogation techniques that in isolation are inherently offensive to a civilized system of justice. 474 U.S. at 109. Cases finding a per se violation of due process are rare, but the Court listed some illustrative cases. In them, police officers used coercive techniques that included extreme psychological pressure or brutal beatings and other physical harm. 474 U.S. at 109; see, e.g., *Ashcraft v. Tennessee*, 322 U.S. 143, 153-54, 64 S. Ct. 921, 88 L. Ed. 1192 (1944) (confession involuntary where the confessant was psychologically pressured by being held for 36 hours incommunicado, without sleep or rest, and was subject to uninterrupted questioning by "relays of officers, experienced investigators, and highly trained lawyers"); *Brown v. Mississippi*, 297 U.S. 278, 56 S. Ct. 461, 80 L. Ed. 682 (1936) (beating and other forms of physical and psychological torture). G.O. has not argued the characteristics of his interrogation were this type of inherently coercive action.

That does not foreclose suppression, however, because under the second path discussed in *Fenton* the Due Process Clause "applies equally when the interrogation techniques were improper only because, in the particular circumstances of the case, the confession is unlikely to have been the product of a free and rational will." 474 U.S. at 110. Applying this aspect of the due process protection requires courts to "assess[] the

16

totality of all the surrounding circumstances—both the characteristics of the accused and the details of the interrogation"—to determine whether a confession is a "'free and unconstrained choice by its maker[.] If it is, if he has willed to confess, it may be used against him. If it is not, if his will has been overborne and his capacity for self-determination critically impaired, the use of his confession offends due process.' [Citation omitted.]" *Schneckloth*, 412 U.S. at 225-26.

In applying this totality-of-the-circumstances examination, "coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary.'" *Connelly*, 479 U.S. at 167. And there must be a "link between coercive activity of the State, on the one hand, and a resulting confession by a defendant, on the other." 479 U.S. at 165. The *Connelly* Court observed that the "sole concern . . . on which *Miranda* was based, is governmental coercion. . . . Indeed, the Fifth Amendment privilege is not concerned 'with moral and psychological pressures to confess emanating from sources other than official coercion.' [Citation omitted.]" 479 U.S. at 170. The flip side of these conclusions is that an accused's susceptibility to coercion does not alone give rise to a due process violation. 479 U.S. at 165. The facts and holding of *Connelly* illustrate this point.

In *Connelly*, the United States Supreme Court reviewed a Colorado Supreme Court decision that upheld the suppression of Francis Barry Connelly's statement. Connelly spontaneously gave the confession after voluntarily approaching a police officer and saying that he murdered someone and wanted to talk about it. The officer advised Connelly of his *Miranda* rights, which Connelly waived because a voice in his head told him he should confess. The Colorado Supreme Court held that Connelly's mental state interfered with his "rational intellect" and his "free will" and "the absence of police coercion or duress does not foreclose a finding of involuntariness. One's capacity for rational judgment and free choice may be overborne as much by certain forms of severe

17

mental illness as by external pressure." *People v. Connelly*, 702 P.2d 722, 728, 729 (Colo. 1985), *rev'd* 479 U.S. 157, 107 S. Ct. 515, 93 L. Ed. 2d 473 (1986).

The United States Supreme Court explicitly rejected this holding and the Colorado court's exclusive reliance on an accused's mental state as the constitutional basis for suppressing a confession. *Connelly*, 479 U.S. at 167. The Court did so after summarizing its caselaw and noting that "cases demonstrate that while mental condition is surely relevant to an individual's susceptibility to police coercion, mere examination of the confessant's state of mind can never conclude the due process inquiry." 479 U.S. at 165. At the same time, it recognized such a holding might be demanded by state rules of evidence. 479 U.S. at 159, 167. It also acknowledged "that as interrogators have turned to more subtle forms of psychological persuasion, courts have found the mental condition of the defendant a more significant factor in the 'voluntariness' calculus. [Citation omitted.]" 479 U.S. at 164. But "this fact does not justify a conclusion that a defendant's mental condition, by itself and apart from its relation to official coercion, should ever dispose of the inquiry into constitutional 'voluntariness.'" 479 U.S. at 164. Instead, an accused's characteristics are relevant to proving the State's coercive conduct induced the confession. 479 U.S. at 164-65, 170-71.

The individual's susceptibility to misconduct remains relevant. In a footnote, the *Connelly* Court noted that "[e]ven where there is causal connection between police misconduct and a defendant's confession, it does not automatically follow that there has been a violation of the Due Process Clause." 479 U.S. at 164 n.2. For support, the Court cited *Frazier v. Cupp*, 394 U.S. 731, 739, 89 S. Ct. 1420, 22 L. Ed. 2d 684 (1969).

There, while interviewing a homicide suspect, police misrepresented the statements of the defendant's cousin who had participated in the crime. The police falsely stated that the cousin had confessed. In addition, they "sympathetically suggested that the

18

victim had started a fight by making homosexual advances." 394 U.S. at 738. The Court examined the totality of the circumstances surrounding the interview. It first mentioned that the defendant had received "partial warnings" of his constitutional rights (he had been told he had a right to an attorney and that anything he said could be used against him). It then also observed that the questioning was of short duration and the defendant was mature and of normal intelligence. The Court concluded the misrepresentation "while relevant, [was] insufficient in our view to make this otherwise voluntary confession inadmissible." 394 U.S. at 739. The Court added that "[t]hese cases must be decided by viewing the 'totality of the circumstances.'" 394 U.S. at 739.

This same totality-of-the-circumstances consideration applies whether the accused is an adult or a minor. But, when the accused is a minor, like G.O., unique characteristics may exist. For example, the *Fare* Court cautioned judges "to take into account those special concerns that are present when young persons, often with limited experience and education and with immature judgment, are involved." 442 U.S. at 725. The Court later further explained that judges considering Fifth Amendment issues should factor in that "children 'generally are less mature and responsible than adults,' . . . 'often lack the experience, perspective, and judgment to recognize and avoid choices that could be detrimental to them,' [and] 'are more vulnerable or susceptible to . . . outside pressures' than adults." *J.D.B. v. North Carolina*, 564 U.S. 261, 272-73, 131 S. Ct. 2394, 180 L. Ed. 2d 310 (2011). See also *State v. Vonachen*, 312 Kan. 451, 464, 476 P.3d 774 (2020) (judges "'must exercise the greatest care in assessing whether the juvenile's inculpatory statement to law enforcement was voluntary'").

These concerns relating to minors fit into the overall consideration of the totality of circumstances of a police interview of a criminal suspect. Whether dealing with a minor or adult, no list can be comprehensive because the circumstances of each case vary. Even so, this court has identified factors that might be relevant to judicial

19

consideration of voluntariness. In doing so, we have emphasized that a court should not merely tally the factors. Nor do the factors necessarily deserve equal weight. Instead, "'a single factor or a combination of factors considered together may inevitably lead to a conclusion that under the totality of circumstances a suspect's will was overborne and the confession was not therefore a free and voluntary act. [Citation omitted.]'" *State v. Sharp*, 289 Kan. 72, 81, 210 P.3d 590 (2009). In other words, a voluntariness outcome does not "turn[] on the presence or absence of a single controlling criterion" but "reflect[s] a careful scrutiny of all the surrounding circumstances." *Schneckloth*, 412 U.S. at 226.

As we have noted, the trial judge considered the circumstances of G.O.'s interrogation and identified several of the factors this court has outlined for consideration when conducting a totality-of-circumstances review. When dealing with minors, we have urged—but not required—judges to consider a minor's age, the length of questioning, the minor's education, the minor's experience with law enforcement, and the minor's mental state. E.g., *State v. Davis*, 268 Kan. 661, 674, 998 P.2d 1127 (2000) (citing seminal case listing factors, *State v. Young*, 220 Kan. 541, 546-47, 552 P.2d 905 [1976]). We have also developed a list of characteristics for judges to consider when conducting a totality-of-the-circumstances review in any case—juvenile or adult. These factors include the accused's mental condition, the manner and duration of interview, the accused's ability to communicate with the outside world, the accused's age and intellect, the officer's fairness in conducting the interview, and the accused's fluency in English. *State v. Gilliland*, 294 Kan. 519, 529, 276 P.3d 165 (2012). Here, the trial judge referred to both the juvenile and the general sets of factors.

In the State's conditional cross-petition for review, it repeats an argument it made to the Court of Appeals. It argues our list should include the factor of whether *Miranda* warnings were given. We have described these lists as nonexclusive, so any relevant factor may—and should—be considered. See, e.g., *Gilliland*, 294 Kan. at 528-29.

Knowledge that one possesses constitutional rights when confronted with the accusation of criminal conduct—the very purpose of the *Miranda* advisory—is relevant. And the United States Supreme Court and other appellate courts commonly list knowledge of the criminal accusations and one's rights when listing circumstances for consideration under the Due Process Clause. E.g., *Schneckloth*, 412 U.S. at 227 (noting relevance of "the failure of the police to advise the accused of his rights"); *Frazier*, 394 U.S. at 739 (noting defendant "received partial warnings of his constitutional rights" and observing that "this is, of course, a circumstance quite relevant to a finding of voluntariness," citing *Davis v. North Carolina*, 384 U.S. 737, 740-41, 86 S. Ct. 1761, 16 L. Ed. 2d 895 [1966]). And, under *Miranda*'s procedural protections of Fifth Amendment rights, it can be a determinative factor in custodial interrogation cases. *Miranda*, 384 U.S. at 444.

We thus revise our factors to explicitly include consideration of whether *Miranda* warnings were given. But we also note that courts likewise consider whether a police officer negates, contradicts, or fails to honor the *Miranda* advisory. See, e.g., *Doody v. Schriro*, 548 F.3d 847, 869 (9th Cir. 2008), *aff'd on reh'g en banc* 596 F.3d 620 (9th Cir. 2010), *vacated on other grounds sub nom. Ryan v. Doody*, 562 U.S. 956, 131 S. Ct. 456, 178 L. Ed. 2d 282 (2010); *Ross v. State*, 45 So. 3d 403, 433-34 (Fla. 2010).

In addition to adding consideration of the giving and honoring of the *Miranda* advisory, we update the list with some other factors illustrated by caselaw. We have split the factors into two categories:  (1) those relating to the details of the interrogation and (2) those relating to the accused. Judges should continue to consider the totality of the circumstances—that is, the circumstances in both categories plus any other relevant circumstances—when deciding whether a state actor's coercive actions induced the confession. Consistent with prior decisions, trial judges need not address every factor, but we urge them to articulate the factors that influence their findings about whether a

21

state actor engaged in coercive conduct and whether that coercive activity induced the confession.

Potential details of the interrogation that may be relevant include: the length of the interview; the accused's ability to communicate with the outside world; any delay in arraignment; the length of custody; the general conditions under which the statement took place; any physical or psychological pressure brought to bear on the accused; the officer's fairness in conducting the interview, including any promises of benefit, inducements, threats, methods, or strategies used to coerce or compel a response; whether an officer informed the accused of the right to counsel and right against self-incrimination through the *Miranda* advisory; and whether the officer negated or otherwise failed to honor the accused's Fifth Amendment rights.

Potential characteristics of the accused that may be relevant when determining whether the officer's conduct resulted in an involuntary waiver of constitutional rights include the accused's age; maturity; intellect; education; fluency in English; physical, mental, and emotional condition; and experience, including experience with law enforcement.

These—and other factors arising from facts of a case—may be relevant no matter whether the accused is a juvenile or an adult, making separate lists unnecessary. But in cases involving a juvenile, we continue to urge judges to exercise great care in weighing these factors to decide whether the juvenile's inculpatory statement to law enforcement was voluntary.

Before applying these considerations to the trial judge's ruling suppressing G.O.'s confession, we add two other points to our overview of applicable law: the burden of proof and the appellate standard of review.

22

2. *Burden of Proof and Standard of Review*

When the protections of the Fifth and Fourteenth Amendments apply, the State bears the burden of proving by a preponderance of the evidence that an individual voluntarily, intelligently, and knowingly waived rights guaranteed by the Fifth Amendment and voluntarily—that is based on the person's unfettered will—made a statement. *Brown*, 286 Kan. at 172. A trial judge examining whether the prosecutor met this burden must first ask whether police or other state actors overreached—that is, did they intimidate, coerce, deceive, or engage in other misconduct? If the answer is no, the police did not violate the defendant's constitutional rights under the Fifth Amendment or the Due Process Clause. If the answer is that the State actor overreached, then the judge must ask whether there the facts establish the "essential link between coercive activity of the State, on the one hand, and a resulting confession by a defendant, on the other." *Connelly*, 479 U.S. at 165.

After a trial court applies that test and makes a voluntariness determination and a party appeals that decision, Kansas appellate courts apply a standard of review that divides the voluntariness determination into questions of fact and questions of law. *Vonachen*, 312 Kan. at 463; *Sharp*, 289 Kan. at 88-89. This mixed standard of review derives from the standard used by the United States Supreme Court when making voluntariness determinations about confessions. See, e.g., *Sharp*, 289 Kan. at 88-89 (citing *Arizona v. Fulminante*, 499 U.S. 279, 287, 111 S. Ct. 1246, 113 L. Ed. 2d 302 [1991]). The Supreme Court's rationale for adopting the mixed question standard of review deserves some discussion because it elucidates how appellate courts should apply the standard and how trial courts should determine if the State has met its burden of persuasion.

The United States Supreme Court in *Culombe v. Connecticut*, 367 U.S. 568, 81 S. Ct. 1860, 6 L. Ed. 2d 1037 (1961), identified a review process involving "at the least," three phases. 367 U.S. at 603."First, there is the business of finding the crude historical facts, the external, 'phenomenological' occurrences and events surrounding the confession." 367 U.S. at 603. This totality-of-the-circumstances phase is normally determined by the trier of fact with the caveat that the findings must be supported by evidence. 367 U.S. at 603. Turning to the second and third phases—the determination of how the accused reacted to the external facts and the legal significance of the reaction—the Court applied a de novo review.

The Court, in explaining why it gave less deference to the trial court when considering the second and third phases, acknowledged the factual aspects of discerning an accused's mental state. But it explained the analysis of mental state in the context of voluntariness could not be siloed as a pure question of fact because the two, "although distinct as a matter of abstract analysis, become in practical operation inextricably interwoven." 367 U.S. at 604. In part, this is "because the apprehension of mental states is almost invariably a matter of induction, more or less imprecise, and the margin of error which is thus introduced into the finding of 'fact' must be accounted for in the formulation and application of the 'rule' designed to cope with such classes of facts." 367 U.S. at 604. In other words, as the Court explained, "the mental state of involuntariness upon which the due process question turns can never be affirmatively established other than circumstantially—that is, by inference; and it cannot be competent to the trier of fact to preclude our review simply by declining to draw inferences which the historical facts compel." 367 U.S. at 605.

Those considerations led the Court to conduct an independent or de novo review of the voluntariness of the confession because "[n]o more restricted scope of review would suffice adequately to protect federal constitutional rights." 367 U.S. at 605. That

24

said, the Court softened its de novo review by indicating it would give "[g]reat weight . . . to the inferences which are drawn by the state courts." 367 U.S. at 605. But those inferences would be tested through consideration of prior decisions because "it is only by a close, relevant comparison of situations that standards which are solid and effectively enforceable—not doctrinaire or abstract—can be evolved." 367 U.S. at 622.

Almost a quarter of a century after *Culombe* and fifty years after the United States Supreme Court had first adopted the mixed question of fact and law standard of review, it was asked to reshape the appellate standard for voluntariness determinations in habeas corpus appeals. The Court declined to do so in *Fenton*, 474 U.S. 104. 474 U.S. at 109-18. The decision to retain the standard was partially guided by a federal habeas corpus statute not applicable here, but the Court also discussed why the standard applied in direct appeals. First, the Court cited the doctrine of stare decisis, noting the long-standing use of the standard. Second, it concluded "the nature of the inquiry itself lends support to the conclusion that 'voluntariness' is a legal question meriting independent consideration." 474 U.S. at 115. Third, and arguably most significantly, it referred to the "uniquely legal dimension" of the right to due process and its constitutional roots. 474 U.S. at 115.

In discussing the legal dimension of a voluntariness determination, the Court acknowledged, as the concurring opinion here suggests, the factual aspects of considering the circumstances of the confession and the characteristics of the suspect. But the Court cited back to the discussion in *Culombe,* 367 U.S. at 603, 605, and noted that "[a]lthough sometimes framed as an issue of 'psychological fact,' the dispositive question of the voluntariness of a confession has always had a uniquely legal dimension. [Citations omitted.]" 474 U.S. at 115-16.

The Court went on to explain that the legal dimension of the right arises because the "locus of the right" is the Due Process Clause under which "the admissibility of a

25

confession turns as much on whether the techniques for extracting the statements, as applied to *this* suspect, are compatible with a system that presumes innocence and assures that a conviction will not be secured by inquisitorial means as on whether the defendant's will was in fact overborne." 474 U.S. at 116. Protection of this constitutional right required the Court to view the voluntariness inquiry as a question of law. The Court concluded "[t]his hybrid quality of the voluntariness inquiry, subsuming, as it does, a 'complex of values,' [citation omitted] itself militates against treating the question as one of simple historical fact" that would warrant deference to the trial judge's decision. 474 U.S. at 116. In other words, as one commentator observed, "No amount of metaphysics will enable a court to discover when a will is overborne. A court can reach this judgment only by analyzing the established facts and comparing them to earlier determinations of when a will was overborne." Comment, *The Standard of Review for the Voluntariness of a Confession on Direct Appeal in Federal Court*, 63 U. Chi. L. Rev. 1311, 1333 (1996).

*Culombe* and *Fenton* are consistent with the standard of review this court has applied and that we reaffirm today. We thus review the trial judge's findings about historical facts regarding the circumstances of the confession as issues of fact. See *Sharp*, 289 Kan. at 88-89 (citing *Fulminante*, 499 U.S. at 287). This means the judge's findings about these factors must be supported by substantial competent evidence or, in other words, evidence that a reasonable person could accept as adequate to support a conclusion. *State v. Talkington*, 301 Kan. 453, 461, 345 P.3d 258 (2015). In assessing whether substantial competent evidence supports the factual underpinnings of a district court's decision, an appellate court does not reweigh the evidence, assess witness credibility, or resolve evidentiary conflicts. *Vonachen*, 312 Kan. at 464. This means that appellate courts disregard any conflicting evidence or other inferences that might be drawn from the evidence. *Unruh v. Purina Mills*, 289 Kan. 1185, 1196, 221 P.3d 1130 (2009).

We then review the question of whether the state actor overreached, the determination of how the accused reacted to the external facts, and the legal significance of the reaction as issues of law. We examine the totality of circumstances and assess de novo the trial judge's legal conclusion based on those facts. This means we give no deference to the trial judge's legal conclusion that G.O. did not voluntarily confess. *Vonachen*, 312 Kan. at 464.

### 3. *Application to Trial Judge's Ruling*

With those considerations in mind, we turn to an analysis of the trial judge's ruling. The judge relied heavily on *State v. R.W.*, 58 Kan. App. 2d 135. Like this case, the trial judge in *R.W.* suppressed a juvenile's confession after finding it involuntary, in large part because of the juvenile's lack of understanding of the interview's purpose.

R.W. was a 17-year-old high school student when interviewed by police officers. He had mental health issues and was coping with sadness and depression due to the recent passing of his father, whose body R.W. had found under tragic circumstances. R.W. had bonded with a school resource officer (SRO), who had recently lost a son. When police investigated a complaint by R.W.'s girlfriend that he had raped her, two detectives contacted the SRO and had him introduce them to R.W.

The officers were introduced by first names only. They explained to R.W. that they wanted to talk to him "'about some stuff that occurred.'" They assured him he was not under arrest, but they took him to a police facility where they interviewed him for four hours. They told him they would take him back to school "'when we're done talking.'" 58 Kan. App. 2d at 137. R.W. was not allowed to call his mother.

27

Like the detective who interviewed G.O., the officers never told R.W. that he was the subject of a criminal investigation, and they obfuscated their role as criminal investigators. On the ride to the police facility, R.W. explained he had bonded with the SRO because they had both lost a family member. After expressing sympathy, one of the officers told R.W. that they were "'kind of like'" an SRO and that their jobs were to "'talk to kids, primarily.'" They explained their jobs were different from an SRO because they were not assigned to a school and an SRO did not have as "'much time to devote to longer-term . . . type of incidents with kids or crises that they're going through.'" 58 Kan. App. 2d at 137-38.

The officers read R.W. his *Miranda* rights but, like the detective's comments to G.O., they said things that downplayed the significance of the *Miranda* advisory. They portrayed it as "'a formality'" they needed to do only because they were in a police station. 58 Kan. App. 2d at 138.

Like the detective who interviewed G.O., the officers did not reveal the true purpose of the interview. Instead, they said, "'[W]e're just trying to understand,'" and they told him they would "'figure it out together.'" They responded to R.W.'s reluctance to talk by saying things like "'we've heard everything before'" and telling him "'it's going to be okay.'" They also said things like "'part of growing up[] is making mistakes and figuring out'" things. They urged him to tell them about his relationship with his girlfriend so he could "'clear his conscience,'" "'heal,'" "'leave it all there,'" "'walk away,'" "'move forward,'" and "'have a successful future.'" They added that his former girlfriend was also "'going to heal, and she's going to be able to move past this . . . and move on with her life, too.'" 58 Kan. App. 2d at 139-41.

The trial judge in *R.W.* found the officers' omissions and obfuscations determinative of the issue of voluntariness because of the significant potential to confuse

28

a juvenile about the purpose and gravity of the situation. The trial judge found the officers' frequent reassurances to R.W. gave him the impression that the interview was like a "'therapy session'" rather than a criminal investigation. 58 Kan. App. 2d at 148. As the trial judge here found, G.O.'s interview is "parallel" in tenor and purported purpose.

The trial judge in *R.W.* found the way the interview was conducted to be the main reason for a finding of involuntariness. But the judge also found other factors played into this—R.W.'s lack of experience with police, other than the SRO whom he considered a friend; R.W.'s mental state following the death of his father; and R.W.'s isolation in the interview room.

The Court of Appeals affirmed, finding that substantial competent evidence supported the trial judge's factual findings. 58 Kan. App. 2d at 145. The Court of Appeals also held that the trial judge applied the correct legal standard and affirmed the suppression. This court denied review.

4. *Totality of Circumstances Around G.O.'s Interview*

Here, the Court of Appeals majority and the State distinguish *R.W.* from G.O.'s circumstances, noting three distinguishing facts. They first observe that the interview in *R.W.* was four hours compared to G.O.'s one hour interview. Second, the police interviewing R.W. offered assurances that no one was in trouble more often than did the detective who interviewed G.O. And, third, G.O. more readily volunteered information than did R.W. While these are valid distinctions, the similarities the trial judge found are striking. The police officers' statements in both interviews were confusing. Given the inexperience and lack of maturity of the teens, the confusing statements provided misleading information about the purpose and gravity of the interviews. The officers in both situations gave the impression that the interview was a therapy session rather than

29

part of a criminal investigation. Like, R.W., G.O. had no experience with law enforcement and was suffering from mental health issues—in G.O.'s case, he was in therapy, being medicated for anxiety and, in his words, he was a "wreck." Nevertheless, the *G.O.* Court of Appeals majority discussed reasons they would not give the same weight to these matters as had the panel deciding *R.W.*, including that substantial competent evidence does not support the trial judge's findings.

Before discussing those conclusions, we observe that in briefs before the Court of Appeals the parties presented no arguments about the trial judge's findings of fact. Instead, the State conceded that substantial competent evidence supported the existence of the four factors about G.O.'s characteristics cited by the trial judge. These factors were G.O.'s educational problems, his anxiety attacks and ongoing therapy, his lack of experience with law enforcement, and his belief that he was talking to the police to help his stepsister and was not in trouble. But it argued the judge erred in its legal determination that the facts required suppression.

The Court of Appeals majority categorized the trial judge's findings in a different manner. It listed five findings it found supported by substantial competent evidence. Those were that the interrogation lasted just under an hour, G.O. was just under 17 years of age, he exhibited a good vocabulary during the interview, his mother drove him to the police station and waited there to drive him home, and the detective read the *Miranda* rights to G.O. 2022 WL 4391366, at *5. The *G.O.* majority concluded substantial competent evidence did not support the judge's findings about G.O.'s education struggles. 2022 WL 4391366, at *6-7. After discussing those findings, the majority found fault with the judge's reliance on *R.W.* and with the judge's legal conclusion that G.O.'s inculpatory statement was involuntary. 2022 WL 4391366, at *8-9. The majority also concluded the detective made no misrepresentations and otherwise did not exceed the fair boundaries of police conduct allowed during interrogations. See 2022 WL 4391366, at *8 ("The record

shows [the detective] made no threats of harm or promises of benefit. Nor does it show [the detective's] undue influence over G.O."). It also impliedly found the trial judge's causation ruling—that G.O. spoke openly because he believed the purpose of the interview was to help his stepsister and that no one would be in trouble—was unsupported. Instead, it concluded that G.O. spoke because he "wanted to clear the air and get something off his chest. G.O. was compelled to confess not by any officer's overreaching acts, but by his own guilty conscience." 2022 WL 4391366, at *9.

The dissenting Court of Appeals judge disagreed with these conclusions, however, noting support in the record for the trial judge's findings. See 2022 WL 4391366, at *12 ("The district court determined that [the detective's] misleading conduct tipped the scale in favor of finding G.O.'s statements involuntary. . . . [The detective's] misleading and inaccurate statements, which can be categorized as unfair interview tactics, weigh heavily in favor of finding G.O.'s statements involuntary, even without consideration of G.O.'s education, mental condition, and inexperience with law enforcement.").

We turn to the factors discussed by the trial judge and the Court of Appeals. We begin with the state actor's conduct—here the detective's comments.

4.1    *Circumstances of the Interview*

The trial judge found that the detective's conduct was the "thing that may really tip the balance" because the detective led G.O. to believe he was there to "talk about what would help his step sister . . . and that nobody was in trouble." We find substantial competent evidence supports the trial judge's findings on these points.

- *The Detective's Statements—Substantial Competent Evidence Review*

31

As for the promises of leniency, the detective at first told G.O. that he would not be "under arrest when we're done." The Court of Appeals correctly noted that G.O. was not arrested then or for about two more years, meaning the detective did not mislead G.O. But the majority did not directly discuss the detective's comment just before he read the *Miranda* rights that "you are not under arrest. You are not going to be under arrest." Unlike the statement the majority highlights about not being under arrest at the end of the interview, this representation had no temporal limitation, and it came within a few words of the detective saying, "This isn't about getting people in trouble." Rather, as the detective repeatedly stated, they were there as the judge found "to talk about what would help his step sister."

Although the Court of Appeals did not directly discuss these representations, it dealt with the comments indirectly. It dismissed all alleged misrepresentations about leniency because Kansas caselaw requires that a police officer's promise of leniency make an individual's statement unreliable, and it concluded the record does not show that G.O. lied. For support, it cited *State v. Garcia*, which held:

> "In order to render a confession involuntary as a product of a promise of some benefit to the accused, including leniency, the promise must concern action to be taken by a public official; it must be such that it would likely cause the accused to make a false statement to obtain the benefit of the promise; and it must be made by a person whom the accused reasonably believed had the power or authority to execute it." 297 Kan. 182, 196, 301 P.3d 658 (2013).

As the Court of Appeals pointed out, under this standard, G.O.'s argument fails because nothing in the record suggests the detective's representations led to a false confession. And we acknowledge that *Garcia* is not our only decision to incorporate this reliability standard as a test of voluntariness. The reliability requirement appears in

32

decisions as long ago as 1966. See *State v. McCarther*, 197 Kan. 279, 285, 416 P.2d 290 (1966).

Despite this history, we now recognize that reliability when applying the Fifth Amendment and the Due Process Clause is contrary to decisions of the United States Supreme Court. The misunderstanding arises from reliance on common-law history and on statutory rules of evidence that test reliability when deciding whether to admit hearsay.

The United States Supreme Court explained this history and reliance. It noted that common-law considerations mainly concerned the reliability of confessions, "recogniz[ing] that coerced confessions are inherently untrustworthy." *Dickerson*, 530 U.S. at 433. This recognition evolved into rules of evidence that allowed judges to admit only trustworthy out-of-court statements under hearsay exceptions. 530 U.S. at 433. Like the federal rules of evidence and other states' rules, Kansas' hearsay statute, K.S.A. 2022 Supp. 60-460(f)(2)(B), includes a reliability test, reflected in the requirement the State's action "must be such that it would likely cause the accused to make a false statement to obtain the benefit of the promise." *Garcia*, 297 Kan. at 196.

The early case of *McCarther* cites this statutory hearsay exception. 197 Kan. at 285 (quoting 1966 version of statutory hearsay exception, which differs from current statute only by using "he" where current statute uses "the accused"). *McCarther* and its progeny conflated the hearsay statute and the voluntariness test under the Due Process Clause of the Fourteenth Amendment. In doing so, *McCarther* did not discuss the United States Supreme Court's holding five years earlier that use of an evidentiary standard "that [takes] into account the circumstance of probable truth or falsity . . . is not a permissible standard under the Due Process Clause of the Fourteenth Amendment." *Rogers v. Richmond*, 365 U.S. 534, 543-44, 81 S. Ct. 735, 5 L. Ed. 2d 760 (1961). Instead, "[t]he

33

aim of the requirement of due process is not to exclude presumptively false evidence, but to prevent fundamental unfairness in the use of evidence whether true or false." *Lisenba v. California*, 314 U.S. 219, 236, 62 S. Ct. 280, 86 L. Ed. 166 (1941).

The *Lisenba* Court explained that states were free to apply evidentiary rules testing whether coercion created a risk of a false confession. "But the adoption of the rule of [the state's] choice cannot foreclose inquiry as to whether, in a given case, the application of that rule works a deprivation of the prisoner's life or liberty without due process of law." 314 U.S. at 236.

Bound as we are by this holding, we overrule *Garcia*, *McCarther*, and other cases that apply K.S.A. 2022 Supp. 60-460(f)(2)(B) for any purpose other than admission of hearsay evidence. This precedent was originally erroneous, and more harm than good would result from continuing the error. See *State v. Larsen*, 317 Kan. 552, 559, 533 P.3d 302 (2023) (discussing exception to stare decisis doctrine when precedent originally erroneous). Neither K.S.A. 2022 Supp. 60-460(f)(2)(B) nor the standard in it apply to an analysis under the Fifth Amendment or the Due Process Clause of the Fourteenth Amendment.

This change in how we apply rules about promises by police officers undermines the Court of Appeals' rationale for rejecting G.O.'s arguments. We are left with statements by the detective to G.O. that he was "not under arrest. You are not going to be under arrest. . . . This isn't about getting people in trouble."

In addition, as the trial judge also found, throughout the interview the detective emphasized the goal was to help G.O.'s stepsister. The detective began the interview by explaining that while he had investigated crimes, "Now I work a lot with kids, usually young, young kids. Okay. The past few weeks I've been kind of talking to your sister,

34

helping, trying to help her out." When G.O. would express reluctance, the detective would return to the theme of helping G.O.'s stepsister. He continued to build on this after G.O., early in the interview, said, "I just want her to get better." The judge found the detective's statements misled G.O. to believe that was the purpose of the interview.

As we have discussed, a law enforcement officer's false promise, lie, or other deception can negate the *Miranda* advisory and provide the "necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause of the Fourteenth Amendment." *Connelly*, 479 U.S. at 167; see *Schriro*, 548 F.3d at 869; *Ross*, 45 So. 3d at 433-34. Here, the detective not only downplayed the *Miranda* warnings, but he also encouraged a full confession if G.O. wanted to avoid prosecution. The detective also misrepresented the true purpose of the interview by repeatedly telling G.O. the purpose of the interview was not about getting anyone in trouble. The trial court's findings on these points are supported by substantial competent evidence.

- *Detective's Statements—Issue of Law*

In turn, these findings significantly influence our de novo review. The detective's comments to G.O. are remarkably like ones made by the officers in *R.W.* There the Court of Appeals concluded the officers' statements "had the significant potential to confuse a juvenile about the purpose and the gravity of his 'talk' with the officers." 58 Kan. App. 2d at 148. And "the potential for confusion was exacerbated by the fact that the officers did not disclose the true purpose of their 'talk.'" 58 Kan. App. 2d at 149. These conclusions apply equally to the circumstances of G.O.'s interview.

The State argues this potential confusion was offset by the fact the detective read G.O. the *Miranda* advisory. While, as the State argues, the fact an individual received the *Miranda* advisories is a circumstance supporting a holding that a statement was

35

voluntarily made, courts have held that downplaying or contradicting the *Miranda* warnings can negate that support. See *Schriro*, 548 F.3d at 869; *Ross*, 45 So. 3d at 433-34. The trial judge concluded that G.O. believed he was being interviewed because "they were there to talk about what would help his step sister . . . and that nobody was in trouble." The concept that the interview would not be used against G.O. diverges from the *Miranda* warning which gave notice that what G.O. said could be used against him.

Another significant factor arises from the various statements in which the detective suggested—and arguably promised—that G.O. would not be arrested. While that comment alone did not suggest G.O.'s answers would not be used against him for any purpose, the detective also said that the purpose of the interview was not to get anyone in trouble. This could be objectively understood as a broader promise that G.O. would not be harmed by any statements he made. These representations—and arguable promises—were not true. They presented him with the option of helping his stepsister, and the false hope that he was progressing toward reintegrating his family, returning to live with his mother, and relieving his anxiety. And he could gain these benefits without the threat of being arrested or otherwise being in trouble. But now the State seeks to use these statements against him.

These statements are like ones considered in *Garcia*, 297 Kan. 182. There, using a totality-of-the-circumstances approach, we held that a police officer's misrepresentation, delivered through proxy, that Miguel A. Garcia would not be booked for murder was a significant factor weighing toward a conclusion that a confession was involuntary. 297 Kan. at 197. Other courts have also held that promises of nonprosecution were a significant factor weighing toward holding that a confession was involuntary. E.g., *United States v. Lall*, 607 F.3d 1277 (11th Cir. 2010); *United States v. Rogers*, 906 F.2d 189 (5th Cir. 1990); *State v. Tamerius,* 234 Neb. 121, 449 N.W.2d 535 (1989).

36

In addition, the circumstances of the dual administrative and criminal proceedings surrounding G.O.'s stepsister had the potential to cause confusion. Under similar circumstances, we held inculpatory statements were involuntary in *State v. Morton*, 286 Kan. 632, 186 P.3d 785 (2008). There, a college-educated adult who had experience with law enforcement involuntarily gave a statement. Karin J. Morton was the subject of an administrative investigation into whether she bought federal surplus property for private use. Local police investigated, and during the investigation Morton had an attorney. Later, a General Service Administration investigator contacted Morton for an interview. He did not make it clear that the interview was part of a criminal investigation and in fact made reassurances that it was not "that kind" of interview and encouraged Morton not to bring her attorney. 286 Kan. at 653-54. While all other circumstances of the interview suggested Morton's statement was voluntarily made, the investigator's misleading comments conveying the interview was not part of a criminal investigation led this court to hold that her statements were not the product of her free and independent will.

Likewise, the confusion caused by the detective's comments to G.O. also weigh toward a determination of involuntariness. While the detective did not discourage G.O. from bringing an attorney, the risk of misleading a juvenile with no experience with law enforcement is even greater than what occurred in *Morton*. As held in *R.W.*, "statements made to juveniles that are likely to mislead them regarding the nature and legal consequences of an interrogation have the potential to render a confession involuntary." 58 Kan. App. 2d at 149. Even G.O.'s mother believed they had to visit with officials and thought the efforts related to a plan to reunite the family and were designed to help G.O.'s stepsister.

The detective's misleading statements thus provide the predicate police overreaching. We turn to examining other factors about the interview to determine if

37

those misleading statements support the conclusion that the detective's misleading statements induced G.O.'s confession.

- *Other Factors About the Interview*

We agree with the Court of Appeals that some factors relating to the nature of the interview point to voluntariness. The interview was comparatively short—just under an hour where, for example, R.W.'s was four hours long. Also, the tone of the interview was friendly, with no raised voices and no threats.

G.O. never asked to speak to his mother, nor did he express concern when the detective told her she could not go with G.O. into the interview room. As the State argues and the Court of Appeals majority concluded, her presence and her knowledge of G.O.'s whereabouts distinguishes *R.W.* But under the circumstances, her presence added to the deceptive nature of the interview. She became a proxy for the detective, confirming his representation that G.O. was not under arrest and that G.O. needed to speak freely and offer details of what had happened. Her introduction of the detective, like the SRO's introduction of the police in *R.W.*, and her facilitation of the interview, while not direct conduct by a state actor, aided and validated the detective's representations that he was just trying to help and had no motive to get anyone in trouble.

Neither the parties nor the Court of Appeals discuss other factors about the nature of the interview, and we see no other relevant circumstance.

In sum, we find substantial competent evidence to support the trial judge's factual finding that a significant factor weighing toward involuntariness was G.O.'s belief that the purpose of the interview was to help his stepsister and was not to get anyone in trouble.

## 4.2  *G.O.'s Characteristics*

The trial judge found four characteristics that contributed to a conclusion G.O.'s statement was involuntary:  his issues with education, his being in therapy, his anxiety diagnosis, and his lack of experience with law enforcement. The Court of Appeals questioned the legal significance of these factors, but it also held that the trial judge's findings of fact about G.O.'s educational issues lacked support from substantial competent evidence.

- *G.O.'s Educational Issues*

Beginning with the substantial competent evidence prong of our standard of review, the Court of Appeals and, before us, the parties spend considerable energy debating the meaning of the trial judge's findings about G.O.'s education and his progress toward graduation. Our review of the record reveals that G.O.'s statement and his mother's testimony supply substantial competent evidence supporting the trial judge's findings that G.O. had struggled and failed many classes. While his new program offered an opportunity to catch up and graduate on time, there is nothing in the record stating he had caught up on his credit at the time of his interview.

Turning to the second prong and the trial judge's legal conclusion, the Court of Appeals concluded "the record shows no link between G.O.'s mild learning disability and his oral comprehension or his ability to respond during the interview." The majority then noted that the video of the interview showed that G.O.'s responses to the detective "were swift, responsive, and showed no confusion or lack of understanding." 2022 WL 4391366, at *6. The State, in its conditional cross-petition for review, makes the same

point. It also contends the detective did not know of G.O.'s educational issues, so could not have used them to coerce G.O. to talk.

These are valid points. But it does not appear that the trial judge weighed this circumstance because she found that G.O. did not understand questions. Rather, the judge seemed to have considered the factor in the context of the overall struggles G.O. faced—the things that made him a wreck in his eyes—rather than as affecting his ability to understand and process what the detective said to him. Overall, the trial judge concluded G.O. was susceptible to the detective's overreaching because of the struggles he had faced, struggles dominated by his emotional and mental health issues.

- *G.O.'s Anxiety Attacks and Ongoing Therapy*

The Court of Appeals likewise noted that G.O.'s mental health problems did not manifest during the interview and no evidence otherwise "show[ed] that any of G.O.'s mental conditions affected his free will at the time he was interviewed." The majority continued by noting that G.O. had not testified, "so we lack his subjective view of that matter." Nor, the majority added, did a doctor testify. 2022 WL 4391366, at *7.

In this passage, the majority was distinguishing *State v. Swanigan*, 279 Kan. 18, 38, 106 P.3d 39 (2005), a case in which an order of suppression was "heavily influenced by evidence of the defendant's low intellectual functioning and his susceptibility to being overcome by anxiety." *G.O.*, 2022 WL 4391366, at *7. In that case a doctor had testified, although the defendant did not. The distinctions drawn by the Court of Appeals are thus valid. But the Court of Appeals went beyond making distinctions to suggest that G.O. had the burden to prove his mental health affected his waiver of his right to remain silent. This ignores the burden of proof that applies here, which is that it is the State's burden to

40

show by a preponderance of the evidence that G.O. confessed voluntarily. *Vonachen*, 312 Kan. at 464.

The trial judge here made no explicit findings about whether the anxiety manifested during the interview. But the judge found that G.O. had experienced anxiety attacks; had been diagnosed with attention deficit disorder, anxiety, and depression; more than likely was on medication at the time of the interview, although G.O.'s mother could not remember what the medication was; and was in bi-weekly therapy. The judge then concluded there were "certainly a number of parallels" between this case and *R.W.*, 58 Kan. App. 2d 135.

In *R.W.*, the only physical sign of anxiety mentioned by the trial judge was that R.W. """nervously pick[ed] at his nails at several points.""" Even so, the trial judge found that R.W.'s mental state "left him vulnerable." 58 Kan. App. 2d at 150. The Court of Appeals agreed, noting the evidence suggested "mental vulnerability and, therefore, a higher potential for coercion." 58 Kan. App. 2d at 151. *R.W.* illustrates that mental health issues need not manifest during the interview before they can be a factor to be weighed in the totality of the circumstances. While the trial judge here did not make the same explicit findings as did the judge in *R.W.*, she noted the similarity in the circumstances in *R.W.* with those here.

We also note that the trial judge had the opportunity to watch G.O. in person during multiple hearings, including a plea colloquy. She thus had the advantage of in-person observation during several hearings to compare G.O.'s demeanor during the interview. We will not substitute our judgment for her assessment that G.O.'s mental and emotional health issues evidenced a vulnerability to coercion.

We conclude substantial competent evidence supports the factual findings made by the trial judge about G.O.'s anxiety, other diagnoses, medications, and therapy and her legal conclusion—implied from her reliance on *R.W.*—that these increased G.O.'s vulnerability to any coercion.

- *G.O.'s Lack of Experience with Law Enforcement*

The next factor the trial judge cited as influencing her decision was G.O.'s lack of exposure to law enforcement. On this point, the parties' arguments before us concern the legal import of this lack of experience, not its factual basis. We find evidence in the record to support the trial judge's finding of fact on this point.

The Court of Appeals majority discounts G.O.'s lack of experience as important, contrasting his lack of experience to R.W.'s trust in the SRO that was ostensibly transferred to the officers who conducted the interview. But, as we have discussed, G.O.'s mother supplied the connection between G.O. and the detective, and she told G.O. he had to talk to the detective. Her trust and understanding of the purpose of the interview—that is, to help her stepdaughter—if nothing else, illustrates how someone more mature misunderstood the situation. G.O.'s lack of contrary experience weighs into his vulnerability to the detective's misleading comments about the purpose of the interview.

### 4.3 *Detective's Actions Induced G.O.'s Confession*

Finally, we consider the trial judge's determination that the detective's actions induced G.O.'s confession. The Court of Appeals discounted the trial judge's holding that the detective's misleading conduct was causally related to G.O.'s confession. G.O. argues the Court of Appeals strayed from the standard of review by reweighing the facts.

The Court of Appeals found G.O.'s confession was motivated by his guilty conscience and he "wanted to clear the air and get something off his chest." 2022 WL 4391366, at *9. This inference has some support in the record. But substantial competent evidence supports the trial judge's finding that G.O. attended the interview and talked to the detective to help his stepsister, and that he believed in doing so, "nobody was in trouble." He told the detective he preferred not to talk "but we have to get somewhere," and other statements he made suggested that his motivation to start talking was to help his sister and to allow for family reintegration. G.O.'s subjective belief is not enough to find the detective's comments coercive. But objectively the combination of the detective's comments are circumstances weighing toward a determination that the detective deceptively led G.O. to believe he was not in trouble, would not be arrested, and was just there to help his stepsister.

The totality of the circumstances also weighs toward concluding G.O. involuntarily waived his Fifth Amendment rights and involuntarily made a confession. We have circumstances in which the detective negated the *Miranda* advisory and represented that G.O. was not in trouble and would not be arrested and general confusion by G.O. and his mother about the distinction between a criminal investigation and the ongoing administrative process to reintegrate the family. Substantial competent evidence also supported the trial judge's findings that G.O.'s emotional state, age, and lack of experience with law enforcement made him vulnerable to being misled. Applying these facts de novo, we conclude the detective's statements negated the *Miranda* warnings and misled G.O. into believing the interview's purpose was to help his stepsister. Inducing these false beliefs was coercive and led to G.O. confessing against his expressed free will not to talk about what had happened. Given G.O.'s general anxiety and other circumstances, through this overreaching, the detective overbore G.O.'s will and, through his statements that the interview would help G.O.'s stepsister, provided the primary

43

motivation for G.O. to give a statement he explicitly said he preferred not to make. G.O.'s statements thus were not the product of his free and independent will.

### *De Novo Determination*

As we have noted, under earlier decisions of this court and of the United States Supreme Court, "the admissibility of a confession turns as much on whether the techniques for extracting the statements, as applied to *this* suspect, are compatible with a system that presumes innocence and assures that a conviction will not be secured by inquisitorial means as on whether the defendant's will was in fact overborne." *Fenton*, 474 U.S. at 116; *Vonachen*, 312 Kan. at 464; *Sharp*, 289 Kan. at 88-89.

This brings us to the second prong of our review at which we conduct a de novo determination of whether the detective's overreaching was compatible with due process considerations. We conclude it was not. Comparing the facts here with other cases holding a defendant had involuntarily confessed illustrates how this overreaching was incompatible with constitutional principles.

CONCLUSION

Accordingly, the trial judge did not err in holding G.O.'s statements were involuntary and thus must be suppressed. We affirm the trial judge's conclusion that the State did not prove by a preponderance of the evidence that G.O.'s confession was voluntary.

Judgment of the Court of Appeals reversing the district court is reversed. Judgment of the district court is affirmed.

44

\* \* \*

STEGALL, J., concurring:  I concur in the reasoning and result of today's decision given that it is dictated by United States Supreme Court precedent. But the longer I sit on this court, the more convinced I become that we must not situate our decisions in the shadows of obscurantist reasoning or amid the distraction of legal pieties. Both are at play here. The Supreme Court's "totality of the circumstances" test by which it conjures a question of "law" out of the factual circumstances of "voluntariness" obscures what is happening—and the popular piety that appellate courts do not find facts or reweigh evidence simultaneously draws attention from the real action.

Indeed, as the Supreme Court makes clear, the crucial question of a defendant's mental state when a confession is made is a question of fact. The "mental state of involuntariness upon which the due process question turns can never be affirmatively established other than circumstantially—that is, by inference." *Culombe v. Connecticut*, 367 U.S. 568, 605, 81 S. Ct. 1860, 6 L. Ed. 2d 1037 (1961). Circumstantial evidence and the drawing of inferences are quintessential fact-finding tools. And yet the Court insists the question is one of law, not fact. Why? Simply put, it is because appellate courts owe no deference to a lower court's determination of legal questions—and the Court wants to play in the voluntariness sandbox.

There may be good reasons for this. But they can never be explored or plainly stated if appellate courts insist on pretending they are not doing what they plainly are doing. Judges have "convinced many people—including themselves—that they use esoteric materials and techniques to build selflessly an edifice of doctrines unmarred" by things like reweighing evidence in a value-laden way. Posner, *How Judges Think* 3 (2008). But a realistic and pragmatic court can and should do better.

45

A clear explanation of today's decision (which reflects Supreme Court precedent) might go something like this. Our Constitution does not tolerate coerced confessions. So to be admissible in court, a confession must have been voluntarily made. Voluntariness is an elusive fact and involves the inner workings of a person's mind and will. Since the best we can do is to look at a defendant's inner state from the outside, it is important for a fact-finder to carefully consider all the circumstances and draw reasonable inferences from those circumstances about what must have been happening inside the defendant's mind. While appellate courts will not normally reweigh the evidence or second guess the trial court fact-finder, we will make an exception in this instance. Indeed, on review, appellate judges must put themselves in the position of fact-finders with respect to this crucial question of voluntariness—that is, we must reweigh the circumstances and inferences carefully. We do this because preventing coerced confessions is so fundamental to our constitutional structure that we cannot leave its enforcement to an inconsistent quilted patchwork of ad hoc decisions made by trial judges. When we allow appellate courts to be the ultimate arbiters of the fact of voluntariness, our caselaw will establish over time the broad circumstances and inferences to be considered in future cases, all of which will better guide law enforcement and achieve more uniform results.