

# IN THE COURT OF CRIMINAL APPEALS
# OF TEXAS

### NOS. PD-0745-23, PD-0746-23, PD-0747-23

### EMANUEL OCHOA, Appellant

### v.

### THE STATE OF TEXAS

### ON THE COURT'S OWN MOTION FOR DISCRETIONARY REVIEW
### FROM THE SECOND COURT OF APPEALS
### COOKE COUNTY

SLAUGHTER, J., delivered the opinion of the Court in which HERVEY, RICHARDSON, YEARY, NEWELL, KEEL, WALKER, and MCCLURE, JJ., joined. KELLER, P.J., dissented.

## O P I N I O N

In 2021, Emanuel Ochoa, Appellant, was convicted of aggravated sexual assault of a child under the age of 6, injury to a child causing serious mental injury, and kidnapping, all stemming from his sexual assault of a five-year-old girl. He was 14 years old at the time of the conduct. The question we must resolve in this case is whether Appellant's statements

to law enforcement were voluntarily made. We conclude that they were not. In evaluating the voluntariness of a juvenile's statement to law enforcement, due process requires that a juvenile "cannot be judged by the more exacting standards of maturity" that would apply to an adult suspect. *Haley v. Ohio*, 332 U.S. 596, 599 (1948). "That which would leave a man cold and unimpressed can overawe and overwhelm" a juvenile suspect, and that is what occurred in this case. *Id.* The tactics used by law enforcement to interview Appellant overwhelmed his will and rendered his resulting confession involuntary in violation of due process under the Fourteenth Amendment to the United States Constitution. The court of appeals erred by failing to afford proper weight to Appellant's status as a juvenile and his lack of maturity in its analysis of this issue. Therefore, we reverse the judgment of the court of appeals which upheld the trial court's ruling denying Appellant's motion to suppress his statement on voluntariness grounds. We now remand the case to the court of appeals for a harm analysis.

## I.       Background and Procedural History

In the early morning hours of February 6, 2018, M.G., who was five years old, went missing from her home. She lived in a mobile home along with her family and several unrelated people, including Appellant, his sisters, and his mother.

After law enforcement was notified of M.G.'s disappearance, a search commenced. M.G. was found later that afternoon underneath another nearby mobile home, wearing a nightgown but no pants or underwear. It was freezing outside, and she was suffering from hypothermia. A trash bag had been wrapped around her and she was underneath a blanket. She was initially alert, but later that day, after being transported to the hospital, she began

to show signs of confusion and possible brain injury. An MRI confirmed that M.G. had suffered a hypoxic brain injury. Medical evidence would later show that M.G. had been sexually assaulted and strangled.

Appellant and Jeremiah Jacques, who also lived in the same trailer as M.G., were the ones who found her. Law enforcement asked both Appellant and Jacques to come to the police station for questioning, and they agreed.

Appellant was transported to the sheriff's office by investigators for the Cooke County Sheriff's Office. Appellant's mother was also present during the transport. Upon arrival at the sheriff's office, Appellant was not handcuffed, and he waited in a public area. It is unclear exactly how long Appellant waited before being interviewed, but the record indicates that Jacques was interviewed before Appellant.[1] After Jacques' interview was completed, Texas Ranger James Holland approached Appellant and his mother outside the interview room, telling them he wanted to get their version of what occurred. Ranger Holland then interviewed Appellant alone, without his mother or an attorney present in the interview room. Ranger Holland spoke to Appellant for a little over an hour before Appellant received magistrate warnings under Family Code Section 51.095.[2] Ranger Holland then continued interviewing Appellant for an additional 20 minutes, at which time

---

[1] Appellant's mother later said during the magistration that she and Appellant had waited "hours" for Ranger Holland to begin the interview.

[2] *See* TEX. FAM. CODE § 51.095(a)(1)(A) (providing that, before child's written or recorded statement is admissible, child must receive warnings from a magistrate detailing the right to counsel, the right to remain silent, and the right to terminate the interview).

Appellant finally confessed to having sexually assaulted M.G. A video recording of the entire interaction between Appellant, Ranger Holland, and the magistrate is in the record.

### Pre-warnings interview

Ranger Holland's initial interview of Appellant lasted from 5:48 p.m. until around 7 p.m. In the small interview room, Appellant sat in the corner, with a table to his left, a chair to his right, and Ranger Holland directly in front of him, sitting 1-2 feet away. Ranger Holland was between Appellant and the doorway, such that he blocked the pathway to the door. Appellant could not have left without asking Ranger Holland to move or climbing over the chair next to him. The door to the room appears to have been unlocked. At several points during the videotaped interview, Ranger Holland can be seen getting up and easily opening the door. At one point Appellant also got up, opened the door, and spoke to someone outside.

At the beginning of the interview, Ranger Holland explained to Appellant that he was a Texas Ranger and that the Rangers are appointed by the Governor and are "the most elite law enforcement agency in the world." He indicated that he was part of an especially elite group of Rangers that solve "100 percent" of the cases they investigate. He explained that he normally only "worked murder cases," but that there was an exception when a child disappears because the Governor "thinks that that is so important . . . that he gets on the phone and he calls" Ranger Holland up personally to ask for his help. He also stated that the Governor told him he was "not coming home" until he found M.G. and solved the case. Ranger Holland then explained to Appellant that his "new home" was Gainesville until "this whole thing was done."

Ranger Holland then asked Appellant for his basic information (name, date of birth, grade, school). He told Appellant that he was not under arrest and that that meant he could "walk over there [to the door] and pull that handle and walk out anytime you wanna leave . . . . No one is going to force you to be in this room. . . . You're free to walk out and go home and go visit with mom whenever you want." He asked Appellant if he understood and Appellant replied, "Yes." Ranger Holland then explained that because there were many people living in the house that M.G. disappeared from, he believed Appellant probably had information that would help him solve the case. Ranger Holland then said, "You want me to go home, right? So please help me solve this." But, he continued, if Appellant decided he did not want to help solve the case and instead wanted to walk out the door, go talk to his mom, or leave and go get a soda pop, that was "cool" with him. Ranger Holland again stated that he wanted Appellant to have a "clear understanding" that "anytime you want to leave this room, you can leave this room" or could stop talking to him.

Ranger Holland and Appellant then began to talk about what happened. Ranger Holland asked Appellant how many people were living in the house. Appellant answered that he was living there with his four sisters, his mother, and six other people, including M.G. and her family. Ranger Holland asked Appellant if he knew what happened, and Appellant said that he knew only that M.G. had gone missing but denied knowing what had happened to her. Ranger Holland then asked Appellant whether he thought a crime was committed. Appellant responded that he believed a kidnapping had occurred. Ranger Holland told Appellant that he was not sure a crime had occurred and that M.G. could have just been playing "hide and seek" with someone. He then shifted his tone and said that if

Appellant did not tell him what happened, then he would start thinking something "really bad" happened. He quickly added that he was "not saying [Appellant] did anything wrong" and was not "accusing him of anything." He told Appellant that he was "not a suspect" but was instead a witness and that "no one was pointing the finger" at him. But Ranger Holland followed this by saying, "If there is anything weird or strange or crazy that happened last night, I'm the type of guy, you just, tell me. I'm not gonna yell at you. I'm not gonna get mad at you. I'm not gonna go tell your mom what you said or anything like that. It's our conversation." He then asked Appellant if this was an accident or a game or if there was some plausible reason for what occurred. Appellant replied that he did not know how M.G. ended up under the trailer, but that she was a "troublemaker" who did not follow directions.

Ranger Holland and Appellant then talked at length about Appellant's version of events. Appellant explained that the last time he had seen M.G. was when she fell asleep in her room the previous night. Appellant said he went to sleep on the couch at midnight and did not see or hear anything unusual after that time. Appellant then described how, upon waking up the next morning, he discovered M.G. was missing and helped look for her. He described how he eventually found her underneath another trailer, shivering, freezing, and unable to speak. Ranger Holland then asked Appellant, "What do you think happened to her?" Appellant replied, "Hopefully she didn't get raped. Because, you know, her pants is not there." Appellant also noted that M.G. smelled like Pine-Sol.

Immediately after this, Ranger Holland began talking about "Freudian slips." He told Appellant that "sometimes when people do things," they "accidentally say things" because their minds are "thinking about something else." He then asked Appellant whether

he knew what the difference was between a good person and a bad person and whether Appellant was a good person or a bad person. Appellant answered that he was a good person but admitted that he sometimes made "mistakes." Ranger Holland next told Appellant that everyone makes mistakes, but that when a good person makes mistakes, he "says I'm sorry, and he moves on down the road and he makes amends." But when a bad person makes a mistake, "they don't ever accept responsibility and they don't ever say they're sorry." Ranger Holland described the latter type of person as being "different" and in a "subspecies of people." He then said that he respects people who can admit that they made a mistake and that he tries to "help" people work through that mistake. He then stated, "A lot of people think law enforcement officers are, kind of, these bad guys, they're always after them, trying to put them in jail or whatever. That's not the case." He continued, "Sometimes bad things happen to good people. Sometimes good people make mistakes. Sometimes things get out of control. Sometimes weird shit, excuse my language, but it just happens." Ranger Holland again stated that it's important to acknowledge our mistakes. He emphasized Appellant's youth and the fact that he had his "whole life" in front of him. "And if you make a mistake, so what?" Ranger Holland continued, "You're fourteen years old, you have time to recover from that mistake. *If* you make amends. *If* you say that you're sorry and you made a mistake. Then people will help you, I will help you. . . .  Now, my job isn't to throw fourteen-year-olds in jail. Okay? I don't do that. That's not me. I'm here to help people. Especially people who can't help themselves sometimes." Ranger Holland continued by stating that he did not believe this was really a kidnapping, but that he thought that "someone" made a mistake and that it "kind of got out of control."

Ranger Holland next discussed the fact that he had a son the same age as Appellant who "screws up all the time." He noted that, when his son made mistakes, he would tell him there were "two different ways" it could go: "You can take responsibility for your actions, you can say you're sorry, or you can deny." Ranger Holland said that when he had issues with his son, it didn't matter what his son did or "how bad it was." If his son "takes accountability for that and says he's sorry, you know what happens? We usually don't even punish him. Okay? We work through it, we make it a life lesson, we talk about why we shouldn't do this, okay?" But Ranger Holland explained that if his son failed to take responsibility and "denies" and "lies" about what he did, that's when he "[has] a problem" because his son was "not taking responsibility for his actions." Ranger Holland again emphasized that it was so important for a person of Appellant's age to take responsibility for his actions.

He then began discussing religion and asked whether Appellant attended church and whether he believed that God took care of people. Appellant replied, "Yes." Ranger Holland then told Appellant that the "people in this community that judge you, that look at you, right? They're all Christians. The judges, the district attorney's office, even the police officers, the juries, the grand juries, they're all made up of Christians." Ranger Holland then asked Appellant whether he knew what the "number one rule of Christianity is." Appellant replied, "No, I'm Catholic." Ranger Holland explained that Catholics were a type of Christian. He then continued by stating that Christians have to "forgive people when they make mistakes." But, "in order to be forgiven, you have to repent, you have to confess your sins." Ranger Holland then asked whether Appellant had ever been to

confession, and Appellant replied, "No, not yet." Ranger Holland then said, "Well, and that's part of it, you have to go and confess your sins and then you make amends, right?"

Ranger Holland continued by telling Appellant that he thought this whole situation was "a big mistake. Would you agree with that?" Appellant replied, "It depends." Ranger Holland pressed Appellant, stating, "You think it's a mistake? You think it's an accident? You think anyone ever really meant to hurt her?" Appellant quietly replied, "I don't know." Ranger Holland then asked, "Did you mean to hurt her?" Appellant said no and quickly added, "I liked that little girl." Ranger Holland replied that he "bet there were times that you punched her or done something because she made you mad." Appellant responded that if M.G. made him mad, he would "just walk away from her" and that he "barely talked to her." Ranger Holland then told Appellant that M.G. was "alive" and "talking" and "she's telling us what happened." He then asked, "Do you know what happened to her?" Appellant replied that all he knew was that M.G. had been missing and he added, unprompted, "hopefully she didn't get raped." Ranger Holland asked, "Do you even know what that means to rape someone?" Appellant gave a response that is not audible on the recording. Ranger Holland then asked Appellant whether he had ever "done anything like that before" and Appellant said no. Appellant also denied that he had ever had sex before.

Ranger Holland then continued by stating that, while he normally investigates crimes, he sometimes "get[s] involved in things [he] didn't need to get involved in because they're not necessarily a crime." He again stated that he thought that what happened here was "a big mistake" and, "if it's a mistake, it's important for that person to stand up and say it's a mistake" or it was an "accident," because if that person accepts responsibility

"right now and here," then that person "can get helped." He continued, "This doesn't have to be this horrible, bad thing, right? No one's going to yell at this person, no one's going to do anything like that." Ranger Holland continued by stating that he believed Appellant was the person who had "made a mistake" and that Ranger Holland needed to "help [him] through this." Up until this point, Appellant had maintained a mostly neutral demeanor, but he then appeared confused and said, "What?" Ranger Holland asked, "Is there any mistake between you and [M.G.]?" Appellant replied, "No. . . . I barely talked to that little girl." Ranger Holland asked if Appellant ever played hide-and-seek with M.G., and Appellant said, more emphatically, "No."

Ranger Holland then pointed at Appellant's pants and asked, "What are those stains on your clothes?" Appellant quickly answered that it was bleach from Lysol. He explained that he had used Lysol to clean up after his dog several weeks ago. Ranger Holland kept pressing Appellant for information about the stains on his pants, and then again stated that "we make mistakes" and that it was "so important" to acknowledge one's mistakes. Ranger Holland continued, "When you start down that road of not being honest and not telling the truth, then things get worse. Alright? She's alive. She's fine. Everything's okay, alright? I can help you through this. But you gotta be honest." Appellant replied, "I am." Ranger Holland again pointed to the stains on Appellant's pants and said that his pants smelled like the cleaning fluid that was on M.G. when she was found. Ranger Holland again told Appellant that M.G. was "already talking" and "if all this comes from her, then it doesn't help you. You gotta take responsibility for your actions up front. . . . You can say that you made a mistake, and I believe that you made a mistake. You didn't mean to hurt her, did

you?" Appellant replied in a frustrated tone, "I never touched her," and pulled the hood on his hoodie up over his head and leaned over to put his head in his hands.

Ranger Holland then asked Appellant whether he remembered their conversation about Freudian slips. Appellant continued looking down and did not answer. Ranger Holland then told Appellant to "look at [him] for a second," scooted closer to Appellant, and put both his hands on Appellant's knees. He told Appellant that he had made a "Freudian slip" five minutes after he entered the room and then continued, "I can smell it, I can smell it on you, I smelled it on her," presumably referring to the cleaning fluid. Ranger Holland then again stated that he believed this was all a mistake and that he could "help [Appellant] through this thing." He continued, "There's no reason for me to drag ten different people in here to [talk to you about this], I don't wanna beat you up, I don't wanna put you in jail. I know you didn't mean to hurt her. But you know, sometimes when we're 14, we do stupid shit. You've made mistakes before, you made amends. Make amends for this one." Appellant did not respond but continued looking down at the floor. Ranger Holland again stated that he was there to "help" Appellant and that he wasn't there to "tell anyone else or do anything." But he continued by stating, "At the end of the day, she's got DNA. You've got the stains on you." Ranger Holland reminded Appellant that M.G. was already talking, so it was only a matter of time before the truth came out. He stated, "We already know. I'm sorry it happened. I know you're sorry it happened." Appellant became agitated and appeared to say, "I didn't f*cking touch her." Ranger Holland replied, "You gotta let us know that you're sorry." Appellant did not respond but continued looking down at the floor. Ranger Holland then told Appellant to "look at" him and said something

inaudible about "bleach." He continued, "I didn't know that you did this before you came in here."

The following portion of the recording is muffled, but it appears that Ranger Holland was detailing the evidence against Appellant because he can be heard stating that Appellant's "DNA is gonna prove that you did that," and he then says, "All I want is to help you." Ranger Holland continued by stating that he "wants this to end" and doesn't want to "drag you through anything, I don't wanna beat you up, I don't wanna beat up your parents or anything. I wanna get you help. You're 14 years old. You still got your whole [inaudible]." He encouraged Appellant to "correct" his mistake and "get on with his life." He asked Appellant what he wanted to do with his life. Appellant, with his hood up, looked down at the floor and would not answer. Ranger Holland then said, "Look at me," and kept asking Appellant, "What do you wanna do?" He then reached over and removed the hood from Appellant's head and leaned over to make eye contact with Appellant. Ranger Holland continued asking Appellant about his job ambitions.  Appellant eventually said that he wanted to be an actor. Ranger Holland responded, "Guess what, you're fourteen years old, you have plenty of time to recover from this. But right now, we need to help you. She's fine. She's gonna be okay." Ranger Holland kept pressing Appellant that if this was a "mistake" then Appellant needed to say it was an "accident." Appellant became agitated and yelled, "I didn't f*cking touch her!"

Ranger Holland continued to suggest that he could "help" Appellant, but only if Appellant was "honest." Ranger Holland told Appellant that if he took responsibility now, this could be considered a "mistake" or an "accident," but if he did not, then it would not

be a mistake, it would be an "intentional lie." Appellant can be seen holding his head and wiping tears away. Ranger Holland then told Appellant, "Look at me. I'm not here to hurt you. I'm not here to beat you up. But I won't leave until it's resolved. . . . I already know what happened. I'm gonna help you through this." He continued, "You didn't mean for this to happen. Did you mean for it to happen? Did you mean for it to happen?" Appellant became agitated, pushed a chair that was next to him, and leaned against the wall, looking away from Ranger Holland. Appellant continued to deny that he did anything to M.G. Ranger Holland asked, "Where do you think this goes, buddy?" He again told Appellant to look at him and said, "There's one person who can help you work through this and it's me right here. Will you help me to help you? You gotta trust me. There's one person in this world that you can trust right now, and there's one person that can help you."

Ranger Holland then asked, "When did you leave the house with her?" Appellant held his head in his hands and did not respond. Ranger Holland continued to tell him that it "doesn't go away" and asked if Appellant wanted his help. Appellant responded, "Why do I need your help if I didn't do nothing?" Ranger Holland responded, "Because I think this was a mistake." He again repeated that M.G. was talking and "we know what happened to her, we know what she's saying. Don't you think it's better to deal with this right now? You know what she's telling us, right?" Appellant kept looking down with his head in his hands. Ranger Holland patted Appellant on the knee and said, "Look at me." Appellant looked up. Ranger Holland continued, "You know that she's telling us everything, right?" Appellant again says, "I didn't do it."

Ranger Holland continued to tell Appellant that M.G. was talking, that things would go "better" for him if he took responsibility, and that he could "help" Appellant "work through" this. Appellant continued denying involvement. Ranger Holland then stated, "You're 14, you're not an adult, okay? You can recover from this. But you gotta admit that you made a mistake." Appellant and Ranger Holland then sat in silence for a few minutes, with Appellant closing his eyes. Ranger Holland said, "Look at me." Appellant yelled out in frustration. Ranger Holland offered Appellant something to eat or drink, but Appellant declined. Ranger Holland then stepped out of the interview room. He explained during the hearing on Appellant's motion to suppress that he left the room because he received a text message from a Cooke County detective suggesting that it would be a "good idea" to call in a magistrate to provide the Family Code warnings.

Ranger Holland returned to the interview room after around 15 minutes. He told Appellant again that he thought he could help Appellant and that he was "bringing someone in" (the magistrate) to help start that process. He again told Appellant that he knew Appellant didn't mean to do anything wrong. Appellant tried to look away and Ranger Holland said, "Hey, look at me. I'm a big boy. 25 years I've been doing this. Okay? I know you're 14, but you're a smart dude. I don't play games, I'm not good with games." But Ranger Holland repeated that he would do everything he could to "help" Appellant and reminded Appellant that he was a Texas Ranger. Some parts of the interview at this point are inaudible, but Ranger Holland can be heard telling Appellant that he is "fourteen and is going to be an actor," that he is going to "move down the road" and go to college for acting school and "become the next Tom Cruise." Ranger Holland then repeated that

Appellant could simply admit his "mistake" and move on down the road. He then left the room.

### *Magistrate Warnings*

After Appellant had been waiting alone in the interview room for around an hour, Judge Carrol Johnson, Justice Court Precinct 2, finally arrived at around 8 p.m. to administer magistrate warnings. The magistration was conducted under the requirements of Texas Family Code Section 51.095, as was appropriate for a 14-year-old who had not yet been criminally charged with any offense. *See* TEX. FAM. CODE § 51.095. Appellant's mother came into the room and was present for the magistration. Judge Johnson testified at the hearing on the motion to suppress that he followed the designated form to ensure that a person is advised of his rights. He also included a description of each right in his own words.

Judge Johnson began by telling Appellant and his mother that he did not work for the sheriff's department but was there to ensure that Appellant's rights were preserved. He explained that "anytime you talk to police officers, you need to know what you're doing." He also stated that he knew nothing about the case, but then stated that "they wanted to talk to [Appellant] as a witness; he's not here under any charges." Judge Johnson advised Appellant that witnesses are afforded "the opportunity to be protected as the law allows." He further informed Appellant that in conversations with police, he had the right to remain silent and not make any statement at all. Judge Johnson told Appellant that anything he said could be used as evidence in the future. But he then qualified this by saying, "I'm not

saying that it would, you just have to be aware that anything you say could come back—you could be asked to talk about it or verify it at a later point in time."

Judge Johnson told Appellant that anytime he came into contact with the police, he had the right to hire an attorney. He added, "Of course, you haven't been charged with anything, but you do have that right." He also added that Appellant had the right to have an attorney present "either prior to any questioning or during any questioning." Judge Johnson told Appellant that if he was "unable to hire an attorney," one "could be appointed for him." But he then stated, "Where that really comes in is if you are charged with a—uh—any kind of crime, no matter what it might be, if you are going to be in [court], those judges are required, if you can't afford to hire an attorney . . . to appoint you an attorney." Appellant's mother then asked whether an appointed lawyer would be on the side of the State. Judge Johnson replied that that was not the case, stating that the appointed attorney represents the client, not the State. Judge Johnson then said that Appellant had the right to have an attorney present to "counsel [him] before or during any interview with police officers or attorneys representing the State." Finally, he informed Appellant of his right to terminate the interview at any time. Judge Johnson explained that this meant that if Appellant decided he was uncomfortable at any point during the interview, "you have the right to stop that interview." He then asked Appellant and his mother whether they understood what he had said and whether they had any questions. Appellant's mother again asked about Appellant's right to an attorney and whether, if they were in court, Appellant would receive appointed counsel. Judge Johnson explained that if Appellant were in court

in the future, he could request counsel at any point. He then asked Appellant and his mother to initial the form to indicate that they had received the warnings.

Appellant's mother then asked whether all of the "witnesses" had been receiving these same warnings, stating, "You're doing this to the people that, they're witnesses?" She asked about whether the other person who had found M.G., Jeremiah Jacques, had also received warnings. Judge Johnson did not directly answer that question but stated, "Anybody that talks to the police, talks to the sheriff's department, they have these same rights." Judge Johnson added that Appellant should not "be afraid" because no one was going to "browbeat" him and stated that "they just wanna talk to him."

Appellant's mother then asked whether, since Appellant was a minor, she was supposed to be present during Ranger Holland's questioning of him. Judge Johnson replied that she did not have to be present the whole time. But he further stated that he wanted to make sure Appellant and his mother were aware that if they were uncomfortable at any point, they could terminate the interview. Appellant's mother again expressed concern that "they" had taken Appellant into the interview room alone and that she had not been asked to be present with her son. Judge Johnson responded that she should "make those wishes known" going forward if she wanted to be present during questioning. Judge Johnson then left the room at around 8:13 p.m. Ranger Holland poked his head in the door and gestured for Appellant's mother to come outside so that he could talk to her. She then left the room.

### *Post-Warnings Confession*

At 8:15 p.m., Ranger Holland re-entered the room alone. He told Appellant that he had been talking to Appellant's mother and had explained to her that he believed he could

"help" Appellant. He asked Appellant what he was thinking right now, and Appellant replied, "Nothing." Ranger Holland reminded Appellant that because of his years of experience he could tell when Appellant was lying. He again encouraged Appellant to take responsibility, "get through this," and "move on down the road." He described the problem Appellant was facing as a "bump in the road" and reminded Appellant that he was young and had "time to recover" from this, but, Appellant "had to be honest." Ranger Holland then told Appellant that he had a DNA sample from the crime scene and he would get a sample of Appellant's DNA to look for a match. Ranger Holland also reminded Appellant that M.G. was talking and telling them what had happened. He continued by stating that the "worst case scenario" would be for Appellant to let this go for a day or two without accepting responsibility. He stated, "You're a juvenile. There's no reason on this deal that you shouldn't be adjudicated as a juvenile. And basically what that means is, they're gonna get you help. You're not going off to prison or any horrible thing like that." But Ranger Holland then warned that it was "the people in the district attorney's office who deal with these things, [and if they] see that there's no remorse, in other words if you're not sorry for it, then they don't let you go to court as a little kid. So, this could go bad, but it doesn't need to."

Ranger Holland then told Appellant that he thought he was a good person who had made a "mistake." He spoke about his own mistakes as a teenager. He again encouraged Appellant to say he was sorry and make amends. Ranger Holland reminded Appellant that there were "people sitting out there who were going to make a determination as to what happens" and that they want to see remorse from Appellant. He continued, "You're a

juvenile, we should keep it that way," and "you can get down the road and get on with your life." But, if Appellant was not sorry and did not show remorse, then "what happens, happens. I don't believe that's you, I know that's not you. . . . Let's work through this thing. You're sorry about what happened, right? It was a mistake?" Appellant put his hands on his face and didn't respond. Ranger Holland then talked again about his training in detecting lies and reminded Appellant that he knew Appellant was lying. He stated again that "he didn't want to play games" but that there was "help out there for you." He told Appellant that the district attorney would want to know whether Appellant was "sorry," and he wanted to be able to tell people that Appellant was a "dumb fourteen-year-old kid who made a mistake and was sorry." He then asked, "Do you want to be saved? Do you want help?" Appellant did not respond and looked at the ground. Ranger Holland then stated, "If you don't want my help, I'm gonna get up and walk outta here." He then told Appellant that Appellant was smart and knew where this was heading within a couple of days based on the evidence. But, Ranger Holland continued, "if you let this go to that point" without expressing remorse, "it's not good." Ranger Holland then referenced the possibility of "them" trying to prosecute Appellant as an adult. He stated, "You don't want that, you want to get through this. You want to get help. Let this be a bump in the road." Ranger Holland then added, "I'm not the DA, I'm none of those people. But you gotta make a decision." He continued, "This may seem bad to you, but it can be fixed. It's not the end of the game." But, he warned, if Appellant kept "running down the road" with DNA evidence and M.G.'s statement "hanging" out there, then "we don't have this conversation.

Do you understand that? Do you understand how important remorse and saying you're sorry is to people?"

At around 8:25 p.m., Ranger Holland pressed Appellant to say "two words" and Appellant asked how that was going to help him. Ranger Holland suggested that it would lift the weight off Appellant's shoulders and "start us moving in the right direction." Appellant asked how "they" were going to help him. Ranger Holland referenced the possibility of counseling and the need to sit down and work through this problem. Ranger Holland asked Appellant if he knew what would happen if he kept doing this kind of thing down the road, and Appellant answered, "Go to jail, and end up dead." Ranger Holland agreed. He asked Appellant whether he wanted the "urges" he was having to go away, and Appellant nodded while crying. Ranger Holland continued, "Don't you think we need to help you, to make sure that you don't ever hurt anyone [again]"? Appellant again nodded while holding his face. Ranger Holland told Appellant he was not a bad person but that he needed help. Appellant cried loudly that he felt like a bad person. Ranger Holland again reminded Appellant that he's fourteen and "young enough" to recover from this mistake. He told Appellant that he knew he "made a mistake" last night but that he did not have to "pay for that mistake for the rest of his life." Ranger Holland asked whether Appellant wanted his help, and Appellant replied, "Yes." Appellant then said he felt like a monster and cried. Ranger Holland told Appellant, "You're gonna be okay. I'm gonna get you help, okay buddy?" Ranger Holland talked more about moving forward and "fixing" Appellant. He asked Appellant if he was sorry and Appellant said, "Yes." Ranger Holland then repeated that "we can work through this" and start the "healing process," that this wasn't

the end of Appellant's life, but was instead a "bump" in the road. Ranger Holland told Appellant that he had so much living to do and could still become an actor. He then asked Appellant to tell him what happened. At 8:35 p.m., Appellant confessed by telling Ranger Holland that he had gone to M.G.'s bedroom at 5 a.m., put a blanket over her head, and took her to another mobile home that was unoccupied. Appellant described how he raped M.G., and because she was screaming and crying, he hit her on the back of the head. He then put her under the nearby trailer where she was later found, and he covered her with a blanket. He attempted to clean her with cleaning solution to cover up evidence of the sexual crime.

Following Appellant's confession, the juvenile court transferred Appellant's case to adult criminal court. *See* TEX. FAM. CODE § 54.02 (setting forth juvenile transfer procedures). Appellant was charged with aggravated sexual assault of a child under the age of 6, injury to a child causing serious mental injury, and aggravated kidnapping. *See* TEX. PENAL CODE §§ 22.021(a)(1)(B), 22.04(a)(2), 20.04. Appellant pled not guilty, and the case was set for trial.

### *Motion to Suppress Oral Statements*

Appellant filed a pretrial motion to suppress his oral statements. In a brief filed in the trial court, Appellant contended that the trial court should suppress his pre-warnings statements because he was in custody at that time and had not received any magistrate warnings, rendering those statements inadmissible. Appellant also contended that his post-warnings statements were rendered involuntary as a result of Judge Johnson's misleading

statements about his rights and Ranger Holland's promises of favorable treatment if he were to confess.

The trial court held a hearing on the motion at which Ranger Holland and Judge Johnson both testified. Ranger Holland testified that Appellant was not under restraint at any point and had come to the sheriff's office with his mother voluntarily. Ranger Holland testified that he told Appellant he could leave whenever he wanted to. Ranger Holland further explained that Appellant never asked for an attorney and that he never made any promises of favorable treatment to Appellant. He testified that when he told Appellant he could "help" him, he was referring to helping Appellant with his psychological problems, not promising to help obtain a favorable outcome for Appellant's case.

Judge Johnson testified that neither Appellant nor his mother expressed any concerns about their understanding of Appellant's rights. Judge Johnson did not believe Appellant showed signs of having been coerced, threatened, or harmed in any way. Regarding Judge Johnson's statement to Appellant that he was there only as a "witness," Judge Johnson explained that he told Appellant that because that was the information that he had been given before entering the interview room.

At the conclusion of the hearing, the trial court denied Appellant's motion to suppress his recorded statements. The trial proceeded, and the video recording of Appellant's confession was admitted into evidence, along with testimony from Ranger Holland describing Appellant's interview and confession. In addition to this evidence, other evidence of Appellant's guilt included a DNA sample taken from inside the fly of

Appellant's underwear, which contained DNA from two people, and M.G. could not be excluded as a contributor to one of the samples.

The jury found Appellant guilty on all three charges and assessed sentences of confinement of 45 years on the sexual assault charge, 55 years on the injury to a child charge, and 20 years on the kidnapping charge. The trial court sentenced Appellant accordingly and ordered the sentences to run concurrently.

### Court of Appeals' Opinion

On direct appeal, the court of appeals affirmed each of Appellant's convictions. *Ochoa v. State*, 675 S.W.3d 793 (Tex. App.—Fort Worth 2023). Appellant had argued, among other complaints, that the trial court erred by denying his motion to suppress his oral statements. Specifically, Appellant again urged that his pre-warnings statements should be suppressed because he was in custody at that point and had not received magistrate warnings, and, further, that his post-warnings statements were rendered involuntary by Ranger Holland's and Judge Johnson's conduct.

With respect to the first of these arguments, the court of appeals disagreed with Appellant that he was in custody during the pre-warnings portion of the interview. *Id.* at 804-06. The court observed that Appellant and his mother had gone to the interview voluntarily as witnesses; Ranger Holland told Appellant at the beginning of the interview that he was free to leave; Appellant's freedom of movement was not restricted in any way; and there was no evidence that Appellant's mother requested to be present during the interview but was blocked from doing so. *Id.* at 805-06.

Nevertheless, the court observed that "some of the circumstances of the interview could have made [Appellant] *subjectively* feel that his movements were in some way restricted." *Id.* at 806. The court cited, amongst such circumstances: the fact that Ranger Holland made statements indicating be believed Appellant was guilty; Appellant's youth; the fact that Appellant was in the room alone with Ranger Holland, who was armed, and Ranger Holland "sat in front of and very close to [Appellant] and at times put his hand on [Appellant] and when [Appellant] would look away or look down, Holland instructed [Appellant] to look at him"; and the fact that the room was "quite small" and the layout meant that Appellant "could not have left the room while Holland was speaking to him without moving or climbing over a chair" to reach the door. *Id.* Despite these circumstances, the court concluded that Appellant was "not under a restraint of freedom to the degree associated with a formal arrest, and the circumstances were not such that a reasonable, innocent person [Appellant's] age would have believed that he was." *Id.*

Turning to the post-warnings portion of the interview, the court of appeals assumed that Appellant was in custody by that point. *Id.* It construed his complaint as encompassing both a claim of involuntariness under the Due Process Clause of the Fourteenth Amendment, as well as a complaint under Texas law. *Id.* at 808. The court of appeals first addressed Appellant's challenge based on Judge Johnson's statements. *Id.* Regarding Judge Johnson's statement that Appellant was there only as a "witness," not a suspect, the court reasoned that the warnings under Family Code Section 51.095 are the same regardless of whether the person is a witness or suspect, and Appellant did not explain how Judge Johnson's description of him as a mere witness affected the voluntariness of his statements.

*Id.* at 809. Further, regarding Judge Johnson's suggestion that the right to an attorney would come into play only if a person were "charged with any kind of crime," the court of appeals expressed "concern" about that statement, but it then cited Judge Johnson's additional statement that Appellant had the right to counsel "before or during any interview with police officers or attorneys representing the State." *Id.* at 809-10. Finally, Appellant had also complained that Judge Johnson told him, after informing him that his statements could be used against him as evidence in the future, "I'm not saying that it would, you just have to be aware that anything you say could come back—you could be asked to talk about it or verify it at a later point in time." The court of appeals rejected Appellant's complaint about that statement because Judge Johnson also expressly told Appellant that "anything" he said could be used as evidence against him. *Id.* at 810. Accordingly, the court of appeals rejected Appellant's challenge to the warnings provided by Judge Johnson and any impact on the voluntariness of Appellant's statements. *Id.*

In a separate discussion, the court of appeals then addressed Appellant's interactions with Ranger Holland. *Id.* Appellant had argued that Ranger Holland effectively promised Appellant he would not be prosecuted as an adult if he were to accept responsibility and confess. Citing this Court's decision in *Garcia v. State*, the court of appeals observed that, under some circumstances, law enforcement's positive promise in exchange for a confession can render that confession involuntary. *Id.* (citing 919 S.W.2d 370, 388 (Tex. Crim. App. 1996) (op. on reh'g)). The court of appeals, however, rejected applicability of that principle here because Ranger Holland did not make any unqualified promise to Appellant, but instead made mere "predictions" about future events. *Id.* at 811 (citing

*Medrano v. State*, 579 S.W.3d 499, 504 (Tex. App.—San Antonio 2019, pet. ref'd)). Further, the court reasoned, general offers to "help" a defendant, or general statements about how a confession might result in more lenient treatment, will not render a confession invalid. *Id.*

The court then went on to finally reject Appellant's contention that Ranger Holland's interview tactics were coercive. *Id.* at 812. The court acknowledged that Appellant was only 14 years old; Holland was armed; the room was small; Appellant sat in a corner with Ranger Holland directly in front of him; and Ranger Holland repeatedly put his hands on Appellant. *Id.* The court of appeals stated that the circumstances showed Ranger Holland was attempting to persuade Appellant to talk, but "none of them show that [Appellant's] will was overborne," "nothing in the video indicated that [Appellant] was not capable of understanding what was happening or what was said to him," he was not physically threatened or deprived of sleep or food, and the interview process lasted less than three hours in total. *Id.* Accordingly, the court of appeals overruled all of Appellant's challenges to the voluntariness of his statements. After rejecting two other points of error,[3] the court of appeals upheld Appellant's convictions. *Id.* at 814.

---

[3] In addition, Appellant argued that: (1) the trial court erred by failing to grant his motion for mistrial after the prosecution improperly commented on his failure to testify during closing arguments, and (2) the fact that he was subject to a possible sentence of life without parole for this offense was unconstitutional. The court of appeals rejected both of those complaints. *See Ochoa*, 675 S.W.3d at 812-14.

Appellant then filed a petition for discretionary review in which he challenged the court of appeals' holding on the voluntariness issue. We refused Appellant's petition for discretionary review, but granted review on our own motion of the following grounds:

1.   Whether the Ranger made a positive promise to Appellant under *Garcia v. State*, 919 S.W.2d 370 (Tex. Crim. App. 1994), when he said that "there's no reason on this deal why you shouldn't be adjudicated as a juvenile. And what that means is they're going to get you help. You're not going off to prison or anything horrible like that."

2.   Whether the "positive promise" standard of *Garcia* applies to juveniles?

3.   Whether the totality of the circumstances in this case rendered Appellant's statement involuntary?

## II.   Analysis

In his brief on discretionary review, Appellant contends that the court of appeals erred by concluding that the *Garcia v. State* positive promise standard does not apply here. *See Garcia*, 919 S.W.2d at 388 (stating that "[a] promise made by a law enforcement officer may render a confession involuntary if it was positive, made or sanctioned by someone with apparent authority, was of some benefit to the defendant and was of such a character as would likely cause a person to speak untruthfully"). He suggests that even if these circumstances do not perfectly fit within that standard, this Court should nevertheless adopt a modified version of that test for situations involving juveniles to account for their lack of sophistication and immaturity in dealing with law enforcement. In the alternative, Appellant contends that, regardless of whether the *Garcia* standard applies here, Appellant's statements were involuntary under a more holistic due process/totality-of-the-

circumstances analysis. The State counters that the court of appeals correctly rejected applicability of the *Garcia* standard and, further, that under the totality of the circumstances Appellant's confession was voluntarily made.

We now conclude that we need not address the first two issues on which we granted review regarding the *Garcia* positive promise standard because we can dispose of this case under the third ground based on a due process analysis. The record reflects that the combined force of Ranger Holland's statements and conduct, plus Judge Johnson's misinformation regarding Appellant's rights, deprived Appellant of his free will in a manner that violated Appellant's due process rights and resulted in an involuntary confession.

### A. Standard of review

When reviewing a trial court's ruling on a motion to suppress, we apply a bifurcated standard of review. *State v. Martinez*, 570 S.W.3d 278, 281 (Tex. Crim. App. 2019). The trial court is the sole trier of fact and judge of the witnesses' credibility and weight to be afforded their testimony. *Wiede v. State*, 214 S.W.3d 17, 24-25 (Tex. Crim. App. 2007). Accordingly, we defer almost totally to a trial court's determinations of historical fact, so long as such determinations are supported by the record, as well as to its rulings on mixed questions of law and fact that hinge on credibility and demeanor. *Martinez*, 570 S.W.3d at 281. We, however, review *de novo* the trial court's rulings on pure questions of law or mixed questions of law and fact that do not hinge on credibility or demeanor. *State v. Espinosa*, 666 S.W.3d 659, 667 (Tex. Crim. App. 2023). "The evidence and all reasonable

inferences are viewed in the light most favorable to the trial court's ruling, and the trial court's ruling must be upheld if it is reasonably supported by the record and is correct under a theory of law applicable to the case." *Id.*

In this case, there are no factual findings from the trial court. This appears to be in error because, under these circumstances, a trial court is required to make written findings on the admissibility of an oral statement. *See* TEX. CODE CRIM. PROC. art. 38.22, § 6 (providing that, "[i]n all cases where a question is raised as to the voluntariness of a statement of an accused, the court must make an independent finding in the absence of the jury as to whether the statement was made under voluntary conditions;" if the court rules the statement admissible, "the court must enter an order stating its conclusion as to whether or not the statement was voluntarily made, along with the specific finding of facts upon which the conclusion was based."). However, the parties do not suggest that it is necessary to abate the appeal for findings because most of the relevant facts are contained in Appellant's videotaped interview. Thus, the facts are largely uncontested. When there are no written findings from the trial court, we may infer the necessary findings that would support the trial court's ruling if the record (viewed in light most favorable to the ruling) supports these implied fact findings. *Johnson v. State*, 414 S.W.3d 184, 192 (Tex. Crim. App. 2013).

**B.     The law of voluntariness affords special protections to juveniles.**

Constitutional principles of due process preclude the use of coerced confessions as fundamentally unfair, regardless of whether the confession is true or false. *Lego v. Twomey*, 404 U.S. 477, 483 (1972); *see also Miller v. Fenton*, 474 U.S. 104, 109 (1985) (holding

that under the due process clause, "certain interrogation techniques, either in isolation or as applied to the unique characteristics of a particular suspect, are so offensive to a civilized system of justice that they must be condemned"). "[C]oercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause." *Colorado v. Connelly*, 479 U.S. 157, 167 (1986). This Court has held that a confession is involuntary for due process purposes when: "(1) [ ] police engaged in activity that was objectively coercive, (2) [ ] the statement is causally related to the coercive government misconduct, and (3) [ ] the coercion overbore the defendant's will." *Lopez v. State*, 610 S.W.3d 487, 494 (Tex. Crim. App. 2020). When a defendant challenges his confession as involuntary, due process requires that the state prove by a preponderance of the evidence that the confession was voluntary. *Lego*, 404 U.S. at 489.

The due-process test for voluntariness takes into consideration the totality of the circumstances. *Dickerson v. United States*, 530 U.S. 428, 434 (2000); *see also In Matter of R.J.H.*, 79 S.W.3d 1, 6 (Tex. 2002) (noting, in context of evaluating voluntariness of juvenile's confession, that "the totality of the circumstances surrounding the making of the confession must be examined to determine whether the confession was the product of an essentially free and unconstrained choice by its maker"); *Griffin v. State*, 765 S.W.2d 422, 427-28 (Tex. Crim. App. 1989) (describing the voluntariness inquiry as whether, under the "totality of the circumstances," "police interrogation techniques alleged to have been coercive, either physically or psychologically, were of such a nature that any confession thereby obtained was unlikely to have been 'the product of a rational intellect and a free will'") (quoting *Mincey v. Arizona*, 437 U.S. 385, 398 (1978)). Voluntariness turns on an

evaluation of *all* the surrounding circumstances, including the "characteristics of the accused and the details of the interrogation." *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973).

In situations involving statements made by juvenile defendants, courts have repeatedly recognized that the totality of the circumstances test must fully take into account the juvenile's lack of experience and maturity as compared to an adult defendant. A 14– or 15–year–old "cannot be compared with an adult in full possession of his senses and knowledgeable of the consequences of his admissions." *Gallegos v. Colorado*, 370 U.S. 49, 54-55 (1962) (holding that the "youth of the petitioner, the long detention, the failure to send for his parents, the failure immediately to bring him before the judge of the Juvenile Court, the failure to see to it that he had the advice of a lawyer or a friend—all these combine to make us conclude that the formal confession on which this conviction may have rested [ ] was obtained in violation of due process"); *see also Haley*, 332 U.S. at 599-601 (observing that 15-year-old suspect was an "easy victim of the law" and that "special care in scrutinizing the record must be used;" "The age of petitioner, the hours when he was grilled, the duration of his quizzing, the fact that he had no friend or counsel to advise him, the callous attitude of the police towards his rights combine to convince us that this was a confession wrung from a child by means which the law should not sanction."). As observed by the United States Supreme Court:

> [A] 14–year–old boy, no matter how sophisticated, is unlikely to have any conception of what will confront him when he is made accessible only to the police. That is to say, we deal with a person who is not equal to the police in knowledge and understanding of the consequences of the questions and

answers being recorded and who is unable to know how to protect his own interests or how to get the benefits of his constitutional rights.

*Gallegos*, 370 U.S. at 54. Thus, when evaluating the totality of the circumstances surrounding a juvenile's confession:

> The totality approach permits—indeed, it mandates—inquiry into all the circumstances surrounding the interrogation, [including] evaluation of the juvenile's age, experience, education, background, and intelligence, and into whether he has the capacity to understand the warnings given him, the nature of his Fifth Amendment rights, and the consequences of waiving those rights.

*Fare v. Michael C.*, 442 U.S. 707, 725 (1979). Further, when an admission is obtained from a juvenile without counsel present, "the greatest care must be taken to assure that the admission was voluntary, in the sense not only that it was not coerced or suggested, but also that it was not the product of ignorance of rights or of adolescent fantasy, fright or despair." *In re Gault*, 387 U.S. 1, 55 (1967). Ultimately, though, while "considerations such as the age and experience of a juvenile" are "relevant factors in the totality of the circumstances analysis, [they] are just that—factors[.]" *Griffin*, 765 S.W.2d at 431; *see also id.* at 428 ("Certainly that the accused is a juvenile is a relevant factor in this analysis, and could well prove determinative where all other circumstances 'would make us pause for careful inquiry if a mature man were involved'") (quoting *Haley*, 332 U.S. at 599).

  **C. Appellant's will was overborne as a result of Ranger Holland's conduct, coupled with the misinformation provided by Judge Johnson.**

We now consider the totality of the circumstances in the record to determine whether they support a finding that Appellant's statements in this case were voluntary, rather than the product of coercion. We conclude that the circumstances demonstrate that

the conduct and statements by Ranger Holland, coupled with the inaccurate statements from Judge Johnson regarding Appellant's rights, collectively operated to undermine Appellant's free will and coerce him into confessing to these offenses.

At the outset, we reiterate that Appellant was only 14 years old at the time of the conduct in question. There is no indication in the record that he had any prior familiarity with the legal system. Indeed, the questions from Appellant's mother inquiring about whether an appointed lawyer would be working for the State suggested that his family was unsophisticated in its understanding of the criminal legal system. Thus, Appellant's youth, lack of maturity, and apparent lack of any prior exposure to the criminal justice system are key factors in our analysis.

Ranger Holland repeatedly told Appellant that he would "help him through this," suggesting that he would help obtain a favorable resolution for Appellant; that it was not his job to put teenagers in prison; that there was "no reason" Appellant should not be treated as a juvenile; and that Appellant was "not going to prison" or anything horrible like that. Ranger Holland also suggested repeatedly that the situation could be treated as a minor "mistake," an "accident," or a "bump in the road," but only if Appellant immediately confessed, otherwise things would go "bad" and he would likely be adjudicated as an adult. Ranger Holland put pressure on Appellant by reminding him, repeatedly, that M.G. was "talking" and that Appellant could not afford to wait even a couple of days to confess if he wanted "help." So long as Appellant confessed quickly, however, Ranger Holland expressed near certainty that Appellant would be treated as a juvenile and would receive lenient punishment (or possibly no punishment at all). And despite the fact that Ranger

Holland acknowledged it was the job of the district attorney to decide what happened next, he also suggested with confidence that, if Appellant accepted responsibility and showed remorse, he would be "forgiven" and could remain in the juvenile system, rather than being criminally charged as an adult.

It is apparent that Ranger Holland's intent with these statements was to downplay the seriousness of the situation and make Appellant believe that if he would just come clean about his guilt, the problem would go away and he could move forward with his life with little or no serious punishment. And Ranger Holland repeatedly told Appellant that he would actively work towards such a favorable resolution—presumably, by using his connections and standing as a Texas Ranger to favorably influence the outcome of Appellant's case. Such assertions, even if they did not rise to the level of an express promise of favorable treatment in exchange for Appellant's confession, were nevertheless highly misleading and, ultimately, untrue. Such tactics, when used to persuade an adult to confess to a crime, may be perfectly acceptable in many cases. But these same tactics, when deployed against a 14-year-old boy who lacks the sophistication or maturity to appreciate the legal consequences of confessing to such serious conduct, can erode that child's free will. While we recognize that Appellant's youth is but one factor to consider in a totality-of-the circumstances analysis, *see Griffin*, 765 S.W.2d at 428, 431, considering all the relevant factors here, Ranger Holland's confident assertion that Appellant could remain in the juvenile system (but only if he confessed immediately) must be afforded significant weight.

We also afford great weight in our analysis to the fact that Appellant's mother was not invited into the interview room while Ranger Holland was present. Based on her questioning of Judge Johnson, Appellant's mother was concerned about the fact that Appellant had no parent by his side during questioning. Appellant also never had an attorney present to represent his interests. And though Appellant never requested counsel, that may have been based on his being misadvised by Judge Johnson regarding the importance of counsel at this juncture. Ultimately, the fact that Appellant was isolated from any adults or legal representatives who could have advocated for his interests is a factor that weighs heavily against a voluntariness finding in this context.

The incorrect statements by Judge Johnson regarding Appellant's rights also contribute to our finding of involuntariness here. Though Judge Johnson provided proper warnings under the Family Code, he then, as someone who "did not work for the sheriff's department," was there to "ensure that [Appellant's] rights were protected," and had been brought in to "help" by Ranger Holland, downplayed the significance of each of the rights he had described. For example, Judge Johnson told Appellant that the right to counsel would "really only come into play" if he were charged with a crime, thereby suggesting that having counsel would not be important or relevant to a person who was merely facing interrogation. Further, Judge Johnson told Appellant that even though he had the right to remain silent, that right really just meant that he might be asked to "verify" his statements to law enforcement later—not that his statements could later be used to convict him in a court of law. Judge Johnson also misinformed Appellant that he was there only as a witness,

not as a suspect, again contributing to the overall false sense that Appellant was not at risk of being charged for any criminal offense.

Several additional relevant factors must be considered. Regarding the physical circumstances of the interrogation, Ranger Holland sat very close to Appellant and, as the court of appeals noted, it would have been difficult or impossible for Appellant to access the door without asking Ranger Holland to move out of the way. At times, Ranger Holland put his hands on Appellant's knees and repeatedly told Appellant to look at him when Appellant tried to look away. When Appellant tried to pull his sweatshirt up over his head to hide, Ranger Holland pulled it back down and insisted that Appellant look at him and talk to him. Ranger Holland was also visibly armed with a service weapon. These circumstances suggested a degree of physical control over Appellant that also weighs against a finding of voluntariness.

In addition, Ranger Holland's emphasis on his status and experience as a Texas Ranger come into play. He stated that the Governor had personally asked him to investigate this case; that his unit solved 100% of the crimes they investigated; that he had been doing this job for 25 years and knew that Appellant was guilty and was lying; and that he was not leaving until the crime was solved and did not want to play games with Appellant. In other moments, Ranger Holland told Appellant that he was the "only" person who could "save" or "help" Appellant out of this situation. These aspects of Ranger Holland's interrogation established that, given Ranger Holland's expertise and stature, it was pointless for Appellant to resist confessing because his guilt would be discovered eventually. Through

these tactics, Ranger Holland exercised a degree of psychological control or dominance over Appellant that, combined with all the other circumstances, would have contributed to Appellant's overall sense of being overwhelmed by pressure to confess.

To be clear, we reiterate that our conclusion as to voluntariness here is not based on any single factor. As is required in such situations, our analysis is necessarily reached only by considering the combined force of all the relevant factors. Weighing those factors, we conclude that they demonstrate that Appellant's will in confessing to these offenses was overborne, such that his confession was not voluntary. *See Schneckloth*, 412 U.S. at 226; *Griffin*, 765 S.W.2d at 427-28.

In support of our conclusion, we take note of the recent decision of the Kansas Supreme Court in *State v. G.O.* as persuasive authority. *See* 543 P.3d 1096 (Kan. 2024). In *G.O.*, a 16-year-old juvenile was suspected of sexually assaulting his stepsister. During police questioning of the juvenile, the detective told G.O. that he was just there to "clear some things up" and that G.O. would not be arrested, and that the situation was not about "getting people in trouble" but was instead just about "trying to fix some things" so that everyone could move on. *Id.* at 1102. But the detective also warned that if G.O. did not tell the truth, then things would "get out of control." *Id.* The Kansas Supreme Court ultimately held that G.O.'s subsequent confession to sexually assaulting his stepsister was involuntary. The Court reasoned that the detective's statements that "nobody was in trouble" and that the primary purpose of the interview was to "help" G.O.'s sister misled G.O. about the purpose of the interview. *Id.* at 1115. The detective also "downplayed" the significance of *Miranda* warnings and "encouraged a full confession if G.O. wanted to

avoid prosecution." *Id.* Further, "G.O.'s emotional state, age, and lack of experience with law enforcement made him vulnerable to being misled." *Id.* at 1119. The Court concluded that the detective's statements induced "false beliefs [that were] coercive and led to G.O. confessing against his expressed free will not to talk about what had happened. . . . [T]hrough this overreaching, the detective overbore G.O.'s will and, through his statements that the interview would help G.O.'s stepsister, provided the primary motivation for G.O. to give a statement he explicitly said he preferred not to make. G.O.'s statements thus were not the product of his free and independent will." *Id.*

While recognizing that there are some distinctions between *G.O.* and this case, we nevertheless believe that similar reasoning applies here. As was the case in *G.O.*, Ranger Holland strongly suggested (almost to the point of guaranteeing) that Appellant would be treated as a juvenile and would not be in any serious trouble if he confessed. Though Ranger Holland did tell Appellant that he was trying to figure out what happened to M.G., he also suggested at various points that it was possible no crime had occurred and that part of the purpose for the interview was getting Appellant the "help" he needed. Like G.O., Appellant expressed resistance to confessing throughout the interview. It was only after a few hours of being in the interrogation room that he finally broke and confessed. The circumstances presented here are such that we are bound to conclude Appellant's resulting confession was not a product of his free and independent will but was instead induced by misleading statements and a downplaying of the gravity of confessing to these offenses.

In reaching the opposite conclusion, the court of appeals erroneously failed to afford adequate weight to Appellant's immaturity and lack of experience in evaluating whether

his free will was undermined. Further, by considering Ranger Holland's conduct in isolation from Judge Johnson's misleading statements about Appellant's rights, the court of appeals engaged in a "divide and conquer" approach to examining voluntariness. But, in considering the totality of the circumstances, courts should evaluate all the factors—the defendant's particular characteristics, the circumstances surrounding the interrogation, *and* law enforcement's conduct that may have been holistically coercive.[4] Considering any factor in isolation may lead to an incorrect conclusion as to voluntariness, as it did in the court of appeals' opinion.

## III.    Conclusion

For the foregoing reasons, we conclude that under the totality of the circumstances Appellant's confession was rendered involuntary under due process principles as a result of coercive law enforcement tactics that overbore Appellant's will. As a 14-year-old juvenile, Appellant cannot be held to the same standards for evaluating voluntariness as an adult suspect. The court of appeals erred by failing to adequately take account of that factor in its analysis of this issue. We, therefore, reverse the court of appeals' judgment that had upheld the trial court's ruling denying Appellant's motion to suppress, and we remand the case to the lower court for a harm analysis.

---

[4] *See, e.g., Shifflett v. Commonwealth*, 716 S.E.2d 132, 136 (Va. Ct. App. 2011) (stating in this context, "[W]e eschew any 'divide and conquer' analysis that ignores the 'totality of the circumstances.'") (quoting *United States v. Arvizu*, 534 U.S. 266, 274 (2002)); *State v. Baker*, 465 P.3d 860, 870 (Haw. 2020) ("Crucially, a court must not analyze the individual circumstances in isolation, but must weigh those circumstances in their totality."); *State v. Fernandez-Torres*, 337 P.3d 691, 696 (Kan. Ct. App. 2014) ("Voluntariness ultimately must be determined holistically.").

Delivered: November 27, 2024

Publish